[No. S148029. July 24, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR LOURDES LENIX, Defendant and Appellant.

## Counsel

A. M. Weisman, under appointment by the Supreme Court, for Defendant and Appellant.

Cliff Gardner; Lawrence A. Gibbs; and Elisabeth Semel for California State Conference of the National Association for the Advancement of Colored People, Rabbi Allen B. Bennett, Dr. James A. Donahue, Suleiman Ghali, Rev. Cannon Charles Gibbs and Rev. Dr. Cecil L. Murray as Amici Curiae on behalf of Defendant and Appellant.

Michael Ogul, Chief Deputy Public Defender (Solano) and Denise Graff, Deputy Public Defender (Orange), for California Public Defenders Association and California Attorneys for Criminal Justice as Amici Curiae on behalf of Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Manuel M. Medeiros, State Solicitor General, Donald de Nicola, Deputy State Solicitor General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Mary Jo Graves and Michael P. Farrell, Assistant Attorneys General, Stan Cross, Janis S. McLean, David A. Rhodes, Janet E. Neeley and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORRIGAN, J.**—Here we determine whether an appellate court must perform a comparative juror analysis for the first time on appeal to evaluate whether the advocate's stated reasons for peremptorily challenging prospective jurors are truthful or pretextual. (See *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).) The United States Supreme Court conducted such a comparative analysis for the first time on appeal in *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El II*)[1] and again recently in *Snyder v. Louisiana* (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203] (*Snyder*). When read in their entirety, those cases stand for the unremarkable principle that reviewing courts must consider all evidence bearing on the trial court's factual finding regarding discriminatory intent. Comparative juror analysis is evidence that, while subject to inherent limitations, must be considered when reviewing claims of error at *Wheeler/Batson*'s third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons. In those circumstances, comparative juror analysis must be performed on appeal even when such an analysis was not conducted below.

Here, defendant's *Wheeler/Batson* motion was properly denied. Accordingly we affirm the judgment of the Court of Appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

After two mistrials, defendant Arthur Lourdes Lenix was convicted of crimes arising from a fatal shooting in Bakersfield.[2] Defendant shot and killed Lamar Rufus. He also shot at and missed Lamar's cousin, Curtis Rufus. The jury convicted him of numerous crimes and enhancements, including first degree

---

[1] As we shall explain, Miller-El's matter first reached the United States Supreme Court in *Miller-El v. Cockrell* (2003) 537 U.S. 322 [154 L.Ed.2d 931, 123 S.Ct. 1029]. To avoid confusion, we shall refer to this earlier case as *Miller-El I*.

[2] The trial court first declared a mistrial based on defense counsel's representation of an irreconcilable conflict of interest. The second trial ended in mistrial after defense counsel became ill.

murder and attempted murder. (Pen. Code, § 187; *id.*, §§ 664, 187.)[3] Defendant was sentenced to a total indeterminate term of 50 years to life in prison, and consecutive determinate terms totaling 21 years.

Because the sole issue presented in this appeal concerns jury selection, we focus on that process. California trial judges have broad discretion over the specific manner in which voir dire is conducted (see Code Civ. Proc., § 223), and practices vary widely. In some courts 12 panelists are selected and questioned. If a panelist is excused for cause or by peremptory challenge, a new panelist is called. Other courts screen larger groups of prospective jurors. Some trial judges do a great deal of questioning, others very little. Some courts place time limits on counsel's questioning and either require or permit counsel to ask group questions. Practices vary in terms of which counsel questions panelists first and who exercises the first peremptory challenge. Advocates who pass an opportunity to challenge retain the option to challenge a seated panelist after an opponent exercises a challenge. The jury is not considered mutually accepted until both sides pass in succession or exhaust their challenges.

In this case, the court announced that it would select 13 jurors. At the end of the trial, one of the 13 would be selected by lot and designated as the alternate. The court conducted jury selection in the following manner. From the entire venire panel, a group of 21 panelists was called and questioned by the court and counsel.[4] After panelists were excused for cause, the court designated 13 of the remaining panelists as the group subject to peremptory challenges. As a member of this group was challenged, his or her seat was filled by the panelist seated next in order until all members of the original group of 21 panelists were seated or excused. The court then called 21 new panelists and the process began again until both counsel accepted the panel by "passing," or exercising no more peremptory challenges.

After the first group of 21 panelists had been questioned, one was excused by the court and the prosecutor then passed for cause. The defense requested that five panelists be excused for cause; the court excused two. The prosecutor then used peremptory challenges against one White and two Hispanic panelists. Alternating with the prosecutor, defense counsel also exercised

---

[3] All further undesignated statutory references are to the Penal Code. Defendant was also convicted of conspiracy to commit murder (§§ 182, 187); possession of a firearm by a convicted felon (§ 12021, subd. (a)(1)); and carrying a loaded firearm in public while an active member of a criminal street gang (§ 12031, subd. (a)(2)(C)). Sentencing enhancements and a prior conviction allegation were found true.

[4] Technically, members of the venire panel do not become jurors until they have been accepted by the court and counsel and sworn as jurors. We will refer to prospective jurors as panelists or panel members.

three peremptory challenges. At this point 12 panelists were seated in the jury box, including L.F., a Black man.

The clerk then called another 21 panelists whom the court and counsel questioned. Among this group was C.A., a Black woman. Defense counsel questioned C.A. first. In response to his questions, C.A. stated she did not know any of the names on the witness list. When asked whether anything about the nature of the case concerned her, C.A. stated "the murder aspect." Defense counsel then asked her if she understood that charges do not equate with guilt and that a determination of guilt must be based on evidence, to which C.A. replied yes. C.A. also stated that she could evaluate the credibility of witnesses and treat all witnesses the same.

The prosecutor subsequently asked C.A., "[Y]ou had indicated to [defense counsel] that you were particularly troubled by some of the charges, especially the murder charges; is that correct?" C.A. answered yes. The prosecutor then inquired, "I know anybody, of course, would be troubled by charges like that, but is there something—if I can ask—is there something beyond that." C.A. replied, "The fact that someone lost a life." The prosecutor then asked, "Have you yourself had anyone close to you involved in something like that?" C.A. answered that her sister's husband, to whom she was close, had been murdered 10 or 11 years ago. When asked if the murder was gang related, C.A. answered yes. The prosecutor asked which gang committed the offense. C.A. said the murder had occurred in Los Angeles County and no one had ever been arrested. Asked if she had "any trouble" with law enforcement for failing to make an arrest, C.A. said no. The prosecutor asked, "Was it one of those situations where basically nobody had an idea who did it?" C.A. said yes, and that she would not hold the experience against defendant. Asked whether there was anything else the parties needed to know about her brother-in-law's murder or any "similar situations," C.A. said no.

Later, the prosecutor asked the entire venire: "Has anybody here had any contacts with law enforcement that were hostile, confrontational, adverse, however you want to describe it, that might carry over into what we're going to do here in this courtroom? Anybody at all? Traffic ticket you didn't feel you deserved?" C.A. was the sole panelist to reply and stated that she had gotten a traffic ticket. When asked whether the officer was impolite "or anything like that," C.A. answered, "No. Well, no one ever feels they deserve a ticket. That was all." The prosecutor asked, "You feel that maybe he was a little shading the truth a little bit in it?" C.A. answered, "Yeah." The prosecutor then asked, "Did you feel you deserved it?" C.A. replied, "I didn't know if I deserved it or not, so I just went along with it."

The court on its own motion excused two panelists in the second group of 21. The prosecutor passed for cause and the court sustained one of defense

counsel's two challenges for cause. A member of the second group was added to the 12 panelists remaining from the first group. The next peremptory challenge was with the prosecutor, who accepted the panel. Defense counsel exercised his fourth peremptory challenge against L.F., the Black panelist, and the prosecutor again accepted the panel. Defense counsel exercised his fifth peremptory challenge, and the prosecutor used his fourth peremptory challenge against a Hispanic panelist. Defense counsel then made a *Wheeler* motion,[5] which the court reserved until the completion of voir dire.

C.A. was then one of the designated 13 panelists subject to peremptory challenge. After defense counsel exercised his sixth peremptory challenge, the prosecutor struck C.A. Defense counsel exercised a seventh peremptory challenge, and both sides accepted the panel. Both sides left unused a substantial number of their allotted peremptory challenges.

The jury was composed of six Caucasians, four Hispanics, and two Filipinos. No Blacks served as jurors or alternates. The record contains no information on whether any Blacks other than C.A. and L.F. participated in the venire.[6]

At the *Wheeler/Batson* hearing, defense counsel pointed out that the prosecutor had excluded three Hispanics and one Black, and claimed the prosecutor "was excluding minorities from the jury, particularly Hispanics." As to the three Hispanic panelists, the prosecutor provided reasons which are not in dispute here.

Regarding C.A., the prosecutor stated that his memory was clearer as to later prospective jurors, but stated, "I was particularly concerned about her statement about the traffic ticket. When I was asking about uncomfortable run-ins with the police, she was actually the only juror who raised her hand. She indicated it was a traffic ticket, but then seemed to indicate that it wasn't adversarial and said that she didn't know the officer was lying, and just kind of didn't fight it because she wanted to take his word for it. Quite honestly, your Honor, I thought there was probably a lot more to it than that, and I felt uncomfortable with her because of that. [¶] I was also somewhat concerned with the fact that her brother [*sic*] was involved in a gang-related homicide,

---

[5] Nearly a decade before *Batson*, California took affirmative steps to ensure that race played no part in jury selection. Thus, the *Wheeler* holding has long been a part of California practice, and a motion of this kind is often referred to as a *Wheeler* motion. Although defendant cited only *Wheeler*, on appeal he also asserts error under the federal *Batson* standard. An objection under *Wheeler* suffices to preserve a *Batson* claim on appeal. (*People v. Lancaster* (2007) 41 Cal.4th 50, 73 [58 Cal.Rptr.3d 608, 158 P.3d 157]; *People v. Gray* (2005) 37 Cal.4th 168, 184, fn. 2 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

[6] When a *Wheeler/Batson* motion has been made, it is helpful for the record to reflect the ultimate composition of the jury.

because it's been my experience more often than not that people who are themselves victims of gangs, not always by any means, but quite often are themselves gang members, and I was concerned with any kind of negative repercussions my case might have in that regard, as well."

Defense counsel did not respond. Addressing all four peremptory challenges, the court stated: "Based on the representations that I have from [the prosecutor] . . . I do not find those challenges to be motivated because of the fact that any of the jurors excused were members of a minority group but rather for other reasons not motivated by any kind of ethnicity or membership in any particular minority group, so I'm going to deny the *Wheeler* motion."

On appeal, defendant limited his *Wheeler/Batson* claim to the challenge of C.A., the Black panelist, arguing the prosecutor's stated reasons were pretextual. The Court of Appeal rejected his argument, observing that the prosecutor's reasons for his challenge were "comprehensible, neither discriminatory nor implausible, and at variance with nothing in the record."

In an "ancillary argument," defendant asserted that the *Miller-El* cases impose a duty on reviewing courts to conduct comparative juror analysis to evaluate the credibility of the prosecutor's reasons for excusing minority prospective jurors. Defendant claimed this duty applies even when a comparative juror analysis was neither requested by defense trial counsel nor otherwise performed by the trial court. The Court of Appeal rejected defendant's argument. Relying on *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270], overruled on other grounds in *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410], the Court of Appeal concluded that comparative juror analysis for the first time on appeal is not constitutionally compelled.

## II.  DISCUSSION

At the time of the Supreme Court's opinion in *Miller-El II, supra*, 545 U.S. 231, our practice with regard to conducting comparative juror analysis for the first time on appeal was described in *People v. Johnson, supra*, 30 Cal.4th 1302: "When the objecting party presents comparative juror analysis to the trial court, the reviewing court must consider that evidence, along with everything else of relevance, in reviewing, deferentially, the trial court's ruling. When such an analysis was not presented at trial, a reviewing court should not attempt its own comparative juror analysis for the first time on appeal . . . ." (*Id.* at pp. 1324–1325.) This practice derived from our view that engaging in comparative juror analysis for the first time on appeal is unreliable and inconsistent with the deference that must be given trial courts. (*Id.* at pp. 1318, 1324.) We stated: "A comparison of the jurors' answers is

unreliable when divorced from the context of the trial. A trial court, but not a reviewing court, is able to place the answers into context and draw meaning from *all* the circumstances, including matters not discernable from the record." (*Id.* at p. 1320.)

Following the *Miller-El II* decision, we have assumed without deciding that a comparative juror analysis should be conducted for the first time on appeal with regard to *Wheeler/Batson*'s third stage. (See *People v. Lewis* (2008) 43 Cal.4th 415, 472 [75 Cal.Rptr.3d 588, 181 P.3d 947]; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1109 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *People v. Stevens* (2007) 41 Cal.4th 182, 196 [59 Cal.Rptr.3d 196, 158 P.3d 763]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1017 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Ledesma* (2006) 39 Cal.4th 641, 679 [47 Cal.Rptr.3d 326, 140 P.3d 657]; *People v. Avila* (2006) 38 Cal.4th 491, 546 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Huggins* (2006) 38 Cal.4th 175, 232 [41 Cal.Rptr.3d 593, 131 P.3d 995]; *People v. Jurado* (2006) 38 Cal.4th 72, 105 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1106 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Schmeck* (2005) 37 Cal.4th 240, 270 [33 Cal.Rptr.3d 397, 118 P.3d 451].) We now decide the issue.

A. *The* Wheeler/Batson *Inquiry*

■ Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. (*Batson, supra*, 476 U.S. at p. 97; *Georgia v. McCollum* (1992) 505 U.S. 42, 59 [120 L.Ed.2d 33, 112 S.Ct. 2348]; *Wheeler, supra*, 22 Cal.3d at pp. 276–277.) Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 [60 Cal.Rptr.3d 209, 160 P.3d 84]; *People v. Avila, supra*, 38 Cal.4th at p. 541.) Here we couch our discussion, both general and particular, in terms of a challenge to the prosecutor's conduct. The principles, procedures and obligations, however, apply equally to all advocates.[7]

■ The *Batson* three-step inquiry is well established. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The

---

[7] Therefore, for ease of discussion, we will refer to the challenged party as the prosecution and the challenger as the defense.

ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. (*Rice v. Collins* (2006) 546 U.S. 333, 338 [163 L.Ed.2d 824, 126 S.Ct. 969].) The three-step procedure also applies to state constitutional claims. (*People v. Bonilla, supra*, 41 Cal.4th at p. 341; *People v. Bell* (2007) 40 Cal.4th 582, 596 [54 Cal.Rptr.3d 453, 151 P.3d 292].)

A prosecutor asked to explain his conduct must provide a " 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." (*Batson, supra*, 476 U.S. at p. 98, fn. 20.) "The justification need not support a challenge for *cause*, and even a 'trivial' reason, if genuine and neutral, will suffice." (*People v. Arias* (1996) 13 Cal.4th 92, 136 [51 Cal.Rptr.2d 770, 913 P.2d 980], italics added.) A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. (See *People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *Wheeler, supra*, 22 Cal.3d at p. 275.) Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. (*Purkett v. Elem* (1995) 514 U.S. 765, 769 [131 L.Ed.2d 834, 115 S.Ct. 1769].) Certainly a challenge based on racial prejudice would not be supported by a legitimate reason.

At the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El I, supra*, 537 U.S. at p. 339.)[8] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. (See *Wheeler, supra*, 22 Cal.3d at p. 281.)

Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. (*People v. Bonilla, supra*, 41 Cal.4th at pp. 341–342.) "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We

---

[8] Here, the trial court requested the prosecutor's reasons for the peremptory challenges and ruled on the ultimate question of intentional discrimination. Thus, the question of whether defendant established a prima facie case is moot. (*Hernandez v. New York* (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 111 S.Ct. 1859]; *People v. Schmeck, supra*, 37 Cal.4th at p. 267; *People v. Welch* (1999) 20 Cal.4th 701, 745–746 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Defendant challenges only the trial court's performance at *Wheeler/Batson*'s third stage.

presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].)[9]

The United States Supreme Court has also emphasized that a state trial court's finding of no discriminatory intent is a factual determination accorded great deference. (*Hernandez v. New York, supra*, 500 U.S. at pp. 364–365.) "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, [citation], and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.' [Citation.] In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie ' "peculiarly within a trial judge's province," ' [citations], and we have stated that 'in the absence of exceptional circumstances, we would defer to [the trial court].' [Citation.]" (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1208].)

## B. *The* Miller-El II *Decision*

When Miller-El was tried for capital murder in a Texas state court, the United States Supreme Court had not yet decided *Batson*. Miller-El moved to strike the jury on the grounds that the prosecution's peremptory challenges to 10 of 11 Black members of the venire violated the equal protection clause. (*Miller-El I, supra*, 537 U.S. at p. 326.)[10] To meet the existing standard of *Swain v. Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824], Miller-El sought to show the prosecution's conduct was part of a larger pattern of discrimination aimed at excluding Blacks from jury service. The trial court denied the motion. (*Miller-El II, supra*, 545 U.S. at p. 236.) Miller-El was subsequently found guilty and sentenced to death. (*Ibid.*)

---

[9] Defendant contends the deferential standard of review is inapplicable here because the trial court made no specific factual findings. On the contrary, the trial court credited the prosecutor's reasons for excluding C.A. and the three Hispanic panelists, finding those explanations, rather than race, were the motivation for the prosecutor's peremptory challenges.

[10] There were originally 20 Black members of the 108-member venire panel. Nine panelists were excused for cause or by agreement. (*Miller-El II, supra*, 545 U.S. at pp. 240–241.)

The Texas Court of Criminal Appeals, the state's criminal court of last resort, remanded the case to the trial court to apply the newly articulated *Batson* standard. Upon remand, the original trial court conducted a *Batson* hearing more than two years after the jury had been empanelled. (*Miller-El I, supra*, 537 U.S. at p. 329.) The court reviewed the voir dire record and permitted one of the prosecutors to provide reasons for previously unexplained peremptory challenges. The trial court accepted the prosecution's proffered reasons, "which the judge called 'completely credible [and] sufficient' as the grounds for a finding of 'no purposeful discrimination.' " (*Miller-El II, supra*, 545 U.S. at pp. 236–237.) The Texas Court of Criminal Appeals affirmed, finding " 'ample support' " in the voir dire record for the prosecutors' explanations. (*Id.* at p. 237.)

Miller-El's case shifted to the federal courts, without initial success. The federal district court denied habeas corpus relief and the Fifth Circuit Court of Appeals blocked the appeal by denying a certificate of appealability. In *Miller-El I, supra*, 537 U.S. 322, the Supreme Court reversed, concluding the certificate of appealability should have issued. (*Id.* at p. 327.) Ultimately, the Fifth Circuit rejected Miller-El's claim on its merits. The Supreme Court again granted certiorari and again reversed. (*Miller-El II, supra*, 545 U.S. at p. 237.)

The *Miller-El II* opinion reveals the case to be a troubling and blatant example of the way in which racism can infect the justice system. It also reflects the high court's commitment to eradicate this pernicious influence. Although noting that " '[f]or more than a century, this Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause' " (*Miller-El II, supra*, 545 U.S. at p. 238), the court nevertheless confronted a case in which it concluded that *undeniably* the state's lawyers had selected and rejected jury panelists because of race. (*Id.* at p. 266.)

*Miller-El II* was even more distressing because state and federal courts had repeatedly affirmed the defendant's death sentence in the face of a "powerful" record of racism. (See *Miller-El II, supra*, 545 U.S. at p. 265.) The Supreme Court was clearly skeptical of the conclusions of these courts and legitimately so. After reviewing the entire record, the Supreme Court determined that the repeated findings by both the trial and appellate courts were utterly unsupported. The court's skepticism was reflected in its language. It noted, for example, that the record revealed "incredible explanations" by the prosecutors in a voir dire process "replete with evidence" of reliance on race (*id.* at p. 265); that "[i]t blinks reality to deny that the State" struck two Black panelists because of their race (*id.* at p. 266); and that the prosecutor's belated explanation of one those challenges "reeks of afterthought" (*id.* at

p. 246). In a vigorous rebuke, the Supreme Court characterized the Fifth Circuit's conclusion "as unsupportable as the 'dismissive and strained interpretation' of [Miller-El's] evidence that we disapproved when we decided Miller-El was entitled to a certificate of appealability." (*Id.* at p. 265.)

The Supreme Court's review was conducted under the Antiterrorism and Effective Death Penalty Act of 1996. Thus, relief was available only if the trial court's acceptance of the prosecutors' explanations was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." (28 U.S.C. § 2254(d)(2); see *Miller-El II, supra,* 545 U.S. at p. 240.) On review, the high court presumed the trial court's factual findings were correct and placed the burden on the defense to establish otherwise by clear and convincing evidence. (28 U.S.C § 2254(e)(1); *Miller-El II,* at p. 240.) The court stated: "The standard is demanding but not insatiable; as we said the last time this case was here, '[d]eference does not by definition preclude relief.' " (*Miller-El II,* at p. 240, quoting *Miller-El I, supra,* 537 U.S. at p. 340.)

The Supreme Court undertook a review of the entire record consistent with *Batson*'s teaching that " 'all relevant circumstances' " may be relied upon in determining whether there had been purposeful discrimination. (*Miller-El II, supra,* 545 U.S. at p. 240.) It noted the "bare statistics," in which the prosecutors used peremptory challenges to excuse nine of the 10 Blacks found qualified to serve. (*Id.* at pp. 240–241.) The court also took into account a remarkable Texas procedure known as the "jury shuffle."[11] "[E]ither side may literally reshuffle the cards bearing panel members' names, thus rearranging the order in which members of a venire panel are seated and reached for questioning." (545 U.S. at p. 253.) Those panelists not examined before the end of the week are dismissed. (*Ibid.*) On two occasions when a number of Black panelists were seated at the front of the panel, the prosecutor "reshuffled." (*Id.* at p. 254.) According to testimony, the district attorney's office admitted it had relied on the shuffling procedure " 'in the past' " to manipulate the racial composition of juries. (*Ibid.*)

The record revealed that for decades before Miller-El's trial, Dallas County prosecutors had "a specific policy of systematically excluding blacks from juries." (*Miller-El II, supra,* 545 U.S. at p. 263.) Although testimony on this point was conflicting, one county judge testified that his former supervisor in the district attorney's office told him that he would be *fired* if he allowed Blacks to serve as jurors. Defendant presented evidence that the district attorney's office gave its prosecutors a manual, known as the "Sparling

---

[11] At the time of the Supreme Court's opinion in *Miller-El II,* the "jury shuffle" practice was authorized under Texas Code of Criminal Procedure, article 35.11. (*Miller-El II, supra,* 545 U.S. at p. 253, fn. 12.)

Manual," written in 1968 by a prosecutor who also became a judge. The manual outlined reasons for excluding minority panelists from jury service. The manual remained in circulation until 1976 or later and was available to at least one of Miller-El's prosecutors. (*Id.* at p. 264.) The court concluded that prosecutors "took their cues" from this manual, as shown by their notes recording the race of each prospective juror. (*Id.* at p. 266.) At oral argument the state claimed these notations could have been made to avoid a *Batson* violation. But the court pointedly observed: "*Batson*, of course, was decided the month *after* Miller-El was tried." (*Miller-El II*, at p. 264, fn. 38, italics added.)[12]

The state offered a variety of reasons for excusing the Black panelists. The prosecution's credibility in asserting those reasons was the key question. The record of voir dire obliterated any semblance of truthfulness. In addition to the factors discussed above, the Supreme Court pointed out that prosecutors used a line of questioning admittedly designed to create cause to strike. (*Miller-El II, supra*, 545 U.S. at p. 261.) Prosecutors asked panelists to state the minimum sentence they would impose for murder. Before answering, 94 percent of White panelists were told that the statutory minimum was five years. Just over 10 percent of Black panelists were given this same information. If a Black panelist responded with a term that was above the five-year minimum, the prosecutor, while normally preferring tough jurors, would rely on this answer to justify a strike. (*Ibid.*)

The Supreme Court characterized the questioning as "trickery" and "manipulative." (*Miller-El II, supra*, 545 U.S. at p. 261.) Prosecutors sought to explain their disproportionate use of this "punishment ruse" on Black panelists. (*Id.* at p. 262, fn. 34.) They claimed that use of the manipulative script was not based on a panelist's race but on opposition or ambivalence to the death penalty reflected in questionnaire or voir dire responses. (*Id.* at pp. 261–262 & fns. 34, 35.) The court tested that explanation against the record, and found that it "flatly fail[ed] to explain" why most White panelists who expressed opposition or ambivalence were never subjected to the "trick question." (*Id.* at p. 262.)

Other evidence considered by the court, and at issue in this appeal, was a comparative juror analysis in which the responses of two excused Black panelists were compared to the responses of non-Black panelists who were allowed to serve. (*Miller-El II, supra*, 545 U.S. at pp. 241–252.) Specifically, as to panelist Billy Jean Fields, the prosecutor claimed he used his peremptory challenge because Fields " 'said that he could only give death if he

---

[12] In *Miller-El II*, this conduct by the prosecution was an example of how the state's explanation could not be reconciled with objective facts. We emphasize, however, that post-*Batson*, recording the race of each juror is an important tool to be used by the court and counsel in mounting, refuting or analyzing a *Batson* challenge.

thought a person could not be rehabilitated.' " (*Id.* at p. 243.) In fact, the record showed that the prosecutor "mischaracterized Fields's testimony" and that "Fields unequivocally stated that he could impose the death penalty regardless of the possibility of rehabilitation." (*Id.* at p. 244.) Thus, the prosecutor's purported "reason" was starkly contradicted by the record. The court pointed out that other White panelists were accepted by the prosecution "with no evident reservations," even though these panelists expressed concerns about imposing death when rehabilitation might be possible. (*Ibid.*) Further, contrary to the prosecutor's claimed concern on this topic, he asked no followup or clarifying questions when nonminority panelists gave answers that raised the topic. (*Id.* at pp. 244–245.)

A second Black panelist, Joe Warren, was asked what he thought the death penalty accomplished. Warren replied, in essence, that he had mixed feelings because while the death penalty might deter crime, it might also relieve a murderer of the suffering he would endure by serving a lengthy prison term. (*Miller-El II, supra,* 545 U.S. at pp. 247–248.) At trial, the prosecution did not mention these remarks when it excused Warren, but at the *Batson* hearing two years later the prosecution identified these " 'inconsistent responses' " as the reason for the challenge. (*Id.* at p. 248.) The Supreme Court observed that, while on its face, the prosecutor's explanation seemed reasonable, "its plausibility is severely undercut" by the prosecutor's failure to object to at least four non-Black jurors who also stated that life in prison was a harsher punishment. (*Ibid.*) As to Warren, the court stated: "The whole of the *voir dire* testimony subject to consideration casts the prosecution's reasons for striking Warren in an implausible light. Comparing his strike with the treatment of panel members who expressed similar views supports a conclusion that race was significant in determining who was challenged and who was not." (*Id.* at p. 252.)[13]

The Supreme Court emphasized that the case for discrimination went beyond the comparative juror analysis to include a broader pattern of practice during the jury selection: "The prosecution's shuffling of the venire panel, its enquiry into views on the death penalty, its questioning about minimum acceptable sentences: all indicate decisions probably based on race. Finally, the appearance of discrimination is confirmed by widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time Miller-El's jury was selected." (*Miller-El II, supra,* 545 U.S. at p. 253.) The court acknowledged that at

---

[13] The Supreme Court employed a time-honored approach to conclude the prosecutors' explanations were repeatedly repudiated by the record. It is common, when considering credibility, to compare a witness's statement against other things the witness has said or not said. Statements are also legitimately compared to other objectively demonstrable facts. Explanations not given at the outset but proffered only after the witness learns additional information may reasonably be viewed with suspicion.

some points the significance of the evidence was open to judgment calls, "but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination." (*Id.* at p. 265.)

## C. *The* Snyder *Decision*

Almost three years after its decision in *Miller-El II*, the United States Supreme Court in *Snyder* once again performed a comparative juror analysis not previously conducted in the trial court. In *Snyder*, the prosecutor exercised peremptory challenges against all five Black panelists. (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1207].) The Supreme Court considered the prosecutor's reasons for challenging one of those panelists, Jeffrey Brooks. In the first phase of jury selection, the court inquired of panelists whether jury service would result in extreme hardship. Brooks explained that he was a college senior who needed to complete his student-teaching requirement to graduate and expressed concern that jury service would cause him to miss classes. The court contacted the university dean, who gave assurances that he would work with Brooks to make up classes. After receiving this information, Brooks expressed no further concern and the prosecutor did not question him further on the issue. (*Id.* at pp. ___–___ [128 S.Ct. at pp. 1209–1210].)

In explaining his peremptory challenge against Brooks, the prosecutor offered two race-neutral reasons. First, he stated that Brooks appeared nervous throughout the voir dire questioning. (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1208].) Second, "[t]he prosecutor claimed to be apprehensive that Mr. Brooks, in order to minimize the student-teaching hours missed during jury service, might have been motivated to find petitioner guilty, not of first-degree murder, but of a lesser included offense because this would obviate the need for a penalty phase proceeding." (*Id.* at p. ___ [128 S.Ct. at p. 1210].) Defense counsel disputed both explanations and the trial court ruled: " 'All right. I'm going to allow the challenge. I'm going to allow the challenge.' " (*Id.* at p. ___ [128 S.Ct. at p. 1208].) The trial and penalty phases concluded two days after Brooks was struck. (*Id.* at p. ___ [128 S.Ct. at p. 1210].)

As to the prosecutor's first explanation, the Supreme Court noted that nervousness cannot be shown from a cold record. Thus, "deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1209].) The trial court in *Snyder*, however, responded to the prosecutor's two proffered reasons by simply allowing the challenge without explanation. Thus the high court would not presume that the trial judge credited the prosecutor's explanation of nervousness. (*Id.* at p. ___ [128 S.Ct. at p. 1209].)

Regarding the second proffered reason the Supreme Court characterized the prosecutor's explanation as "highly speculative." (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1210].) The court also stated, "Perhaps most telling, the brevity of petitioner's trial—something that the prosecutor anticipated on the record during *voir dire*—meant that serving on the jury would not have seriously interfered with Mr. Brooks' ability to complete his required student teaching." (*Ibid.*, fn omitted.)

■ The Supreme Court additionally considered evidence of comparative juror analysis in evaluating the prosecutor's second reason: "The implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks'." (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1211].) Before undertaking its analysis the court cautioned: "We recognize that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable. In this case, however, the shared characteristic, *i.e.*, concern about serving on the jury due to conflicting obligations, was thoroughly explored by the trial court when the relevant jurors asked to be excused for cause." (*Ibid.*)[14]

The Supreme Court noted that White Juror Roland Laws, a self-employed general contractor, offered strong work and family reasons as to why jury service would cause him hardship. (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1211].) The Supreme Court observed that while these obligations "seem[ed] substantially more pressing" than those of Mr. Brooks, the prosecution declined to use a peremptory challenge to strike him. (*Ibid.*) "If the prosecution had been sincerely concerned that Mr. Brooks would favor a lesser verdict than first-degree murder in order to shorten the trial, it is hard to see why the prosecution would not have had at least as much concern regarding Mr. Laws." (*Ibid.*)

---

[14] In a footnote following this paragraph, the Supreme Court stated: "The Louisiana Supreme Court did not hold that petitioner had procedurally defaulted reliance on a comparison of the African-American jurors whom the prosecution struck with white jurors whom the prosecution accepted. On the contrary, the State Supreme Court itself made such a comparison. See [*State v. Snyder* (La. 2006)] 942 So.2d 484, 495–496 . . . ." (*Snyder, supra*, 552 U.S. at p. ___, fn. 2 [128 S.Ct. at p. 1211, fn. 2].)

The Attorney General interprets the footnote as suggesting the Supreme Court would honor a state procedural rule requiring that comparative juror analysis be conducted first in the trial court or be deemed forfeited. Of course, the court did not actually say that. The intended meaning of the footnote remains unclear. Without further guidance from the Supreme Court, we do not attempt to discern its meaning.

The court noted the circumstances of another White juror who twice addressed the court during voir dire about important work commitments. The juror advised that in order to serve he would have to cancel an urgent appointment at which his presence was essential. Despite the juror's concern, the prosecution did not strike him. (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1212].)

### D. *The Effect of* Miller-El II *and* Snyder *on Our Comparative Juror Analysis Practice*

Neither *Miller-El II* nor *Snyder* changed the *Batson* standard. An advocate's jury selection decisions remain a discretionary prerogative, but race-based decisions are not constitutionally tolerable. (*Miller-El II, supra*, 545 U.S. at pp. 237–240.) Both court and counsel bear responsibility for creating a record that allows for meaningful review. (See *id.* at pp. 251–252; *Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1209].) Review is deferential to the factual findings of the trial court, but that review remains a meaningful one. As the high court described it, " '[d]eference does not by definition preclude relief.' " (*Miller-El II, supra*, 545 U.S. at p. 240.) When reasons are given for the exercise of challenges, an advocate must "stand or fall on the plausibility of the reasons he gives." (*Id.* at p. 252.) The plausibility of those reasons will be reviewed, but not reweighed, in light of the entire record. (See *id.* at pp. 265–266.)

In reviewing the plausibility of the prosecutors' reasons for their strikes, the *Miller-El II* court considered various kinds of evidence, including a comparison of panelists' responses. It stated: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence *tending* to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El II, supra*, 545 U.S. at p. 241, italics added.) *Miller-El II* quoted *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133 [147 L.Ed.2d 105, 120 S.Ct. 2097], an employment case, in which the high court stated that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." (*Id.* at p. 147; see *Miller-El II*, at p. 241.) As the *Batson* court observed, "In deciding if the defendant has carried his burden of persuasion, a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' [Citation.]" (*Batson, supra*, 476 U.S. at p. 93.)

In *Snyder*, the high court recognized the potentially misleading nature of a retrospective comparative juror analysis performed on a cold record, but

nevertheless relied on this evidence as bearing on the question of the prosecutor's credibility. (*Snyder, supra*, 552 U.S. at pp. ___–___ [128 S.Ct. at pp. 1211–1212].)

■ *Miller-El II, supra*, 545 U.S. 231, and *Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. 1203], demonstrate that comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination. These cases stand for the proposition that, as to claims of error at *Wheeler/Batson*'s third stage, our former practice of declining to engage in comparative juror analysis for the first time on appeal unduly restricts review based on the entire record.[15] As the high court noted in *Snyder*, "In *Miller-El* v. *Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, *all* of the circumstances that bear upon the issue of racial animosity *must* be consulted." (*Snyder*, at p. ___ [128 S.Ct. at p. 1208], italics added.) Thus, evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons.

Nevertheless, like the *Snyder* court, we are mindful that comparative juror analysis on a cold appellate record has inherent limitations. (See *Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1211].) Experienced trial lawyers recognize what has been borne out by common experience over the centuries. There is more to human communication than mere linguistic content. On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. "Even an inflection in the voice can make a difference in the meaning. The sentence, 'She never said she missed him,' is susceptible of six different meanings, depending on which word is emphasized." (*Tallman* v. *ABF* (*Arkansas Best Freight*) (Ct.App. 1988) 108 N.M. 124 [767 P.2d 363, 366].) "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record." (*Reynolds* v. *United States* (1878) 98 U.S. 145, 156–157 [25 L.Ed. 244].)

---

[15] Our holding today does not implicate claims of error at *Wheeler/Batson*'s first stage. As our case law establishes, "[t]he high court [in *Miller El II*] did not consider whether appellate comparative juror analysis is required 'when the objector has failed to make a prima facie showing of discrimination.' [Citation.] A fortiori, *Miller-El* [*II*] does not mandate comparative juror analysis in a first-stage *Wheeler-Batson* case when neither the trial court nor the reviewing courts have been presented with the prosecutor's reasons or have hypothesized any possible reasons." (*People v. Bell, supra*, 40 Cal.4th at p. 601; accord, *People v. Howard* (2008) 42 Cal.4th 1000, 1020 [71 Cal.Rptr.3d 264, 175 P.3d 13]; *People v. Bonilla, supra*, 41 Cal.4th at p. 350.)

For example, two panelists may each state he or she was arrested for driving under the influence of alcohol and pled guilty. In response to questions by the prosecutor, each may state he or she harbors no ill feeling against the police as a result of the incident and will not hold that experience against the prosecution. One panelist may deliver that answer in a way that conveys embarrassment, remorse and authenticity of response. The other panelist may answer with a tone of voice, gesture, expression or hesitation that conveys strong negative feelings about the experience and belies the truthfulness of the answer. A transcript will show that the panelists gave similar answers; it cannot convey the different ways in which those answers were given. Yet those differences may legitimately impact the prosecutor's decision to strike or retain the prospective juror. When a comparative juror analysis is undertaken for the first time on appeal, the prosecutor is never given the opportunity to explain the differences he perceived in jurors who seemingly gave similar answers.

Moreover, the selection of a jury is a fluid process, with challenges for cause and peremptory strikes continually changing the composition of the jury before it is finally empanelled. As we noted in *People v. Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047]: "[T]he particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one or more of the supposed favorable or strong jurors is excused either for cause or [by] peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain. These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors." (*Id.* at p. 1220.)

Ultimately, an advocate picking a jury is selecting a committee to decide the case. In addition to each panelist's individual characteristics, the group must be able to work together with courtesy and dispassion to reach a complex result with substantial consequences. An advocate is entitled to consider a panelist's willingness to consider competing views, openness to different opinions and experiences, and acceptance of responsibility for making weighty decisions. Once empanelled, the jury wields tremendous power over the outcome of the case. Even the opportunity to question each panelist individually for the few minutes allotted provides only a glimpse into the panelist's thoughts, decisionmaking ability, experiences, and willingness

to discharge the panelist's important duty. Each juror becomes, to a certain degree, a risk taken. Voir dire is a process of risk assessment. As the Supreme Court observed, "potential jurors are not products of a set of cookie cutters." (*Miller-El II, supra*, 545 U.S. at p. 247, fn. 6.) Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.

█ For these reasons, comparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard. Contrary to assertions by amici curiae, advocates can object to disparate treatment of similarly situated jurors at trial without having reviewed voir dire transcripts. *Wheeler/Batson* motions are routinely argued based on the voir dire notes and memory of the prosecution, defense, and trial court. Comparative juror analysis is no different. Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent. (See *Hernandez v. New York, supra*, 500 U.S. at p. 365.) Additionally, appellate review is necessarily circumscribed. The reviewing court need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment. Further, the trial court's finding is reviewed on the record as it stands at the time the *Wheeler/Batson* ruling is made. If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments.

The inherent limitations of comparative juror analysis can be tempered by creating an inclusive record. *Miller-El II* and *Snyder* demonstrate that an adequate record is critical for meaningful review. Counsel and the trial court bear responsibility for creating such a record. *Miller-El II* admonishes prosecutors faced with a *Wheeler/Batson* claim to provide as complete an explanation for their peremptory challenge as possible. The high court stated: "It is true that peremptories are often the subjects of instinct, *Batson v. Kentucky, supra*, [476 U.S.] at 106 . . . , (Marshall, J., concurring), and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not

have been shown up as false." (*Miller-El II, supra*, 545 U.S. at p. 252.) The high court cautioned that efforts by a trial or reviewing court to "substitute" a reason will not satisfy the prosecutor's burden of stating a racially neutral explanation. (*Ibid.*) For this reason, trial courts must give advocates the opportunity to inquire of panelists and make their record. If the trial court truncates the time available or otherwise overly limits voir dire, unfair conclusions might be drawn based on the advocate's perceived failure to follow up or ask sufficient questions. Undue limitations on jury selection also can deprive advocates of the information they need to make informed decisions rather than rely on less demonstrable intuition.[16]

■  As to trial judges, the court in *Miller-El II* emphasized that it is the *trial court's* duty to "assess the plausibility" of the prosecutor's proffered reasons for striking a potential juror "in light of all evidence with a bearing on it." (*Miller-El II, supra*, 545 U.S. at p. 252.) The *Snyder* court stated that the trial court bears a "pivotal role in evaluating *Batson* claims," for the trial court must evaluate the demeanor of the prosecutor in determining the credibility of proffered explanations, and the demeanor of the panelist when that factor is a basis for the challenge. (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1208].)

It should be discernable from the record that (1) the trial court considered the prosecutor's reasons for the peremptory challenges at issue and found them to be race neutral; (2) those reasons were consistent with the court's observations of what occurred, in terms of the panelist's statements as well as any pertinent nonverbal behavior; and (3) the court made a credibility finding that the prosecutor was truthful in giving race-neutral reasons for the peremptory challenges. As to the second point, the court may not have observed every gesture, expression or interaction relied upon by the prosecutor. The judge has a different vantage point, and may have, for example, been looking at another panelist or making a note when the described behavior occurred. But the court must be satisfied that the specifics offered by the prosecutor are consistent with the answers it heard and the overall behavior of the panelist. The record must reflect the trial court's determination on this

---

[16] It is true that under Code of Civil Procedure section 223 a criminal trial court may limit counsel's questioning of prospective jurors and "may specify the maximum amount of time that counsel for each party may question an individual juror, or may specify an aggregate amount of time for each party, which can then be allocated among the prospective jurors by counsel." The exercise of discretion by trial judges in conducting voir dire is accorded considerable deference by appellate courts. (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1313 [7 Cal.Rptr.2d 676].) Nevertheless, in exercising that discretion, trial courts should seek to balance the need for effective trial management with the duty to create an adequate record and allow legitimate inquiry. We express no opinion regarding appropriate voir dire procedures in those cases occurring before Code of Civil Procedure section 223 was amended, effective 2001. (Stats. 2000, ch. 192, § 1.)

point (see *Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1209]), which may be encompassed within the court's general conclusion that it considered the reasons proffered by the prosecution and found them credible.

■ In terms of appellate review, *Miller-El II* emphasized that the question of purposeful discrimination continues to involve an examination of *all* relevant circumstances. Comparative juror analysis was only one part of the Supreme Court's exhaustive review in an egregious case. The court did not rule that comparative juror analysis, standing alone, would be sufficient to overturn a trial court's factual finding. Instead the court emphasized: "The case for discrimination goes beyond these [juror] comparisons to include broader patterns of practice during the jury selection." (*Miller-El II, supra*, 545 U.S. at p. 253.) Viewing the evidence in its totality, the court stated: "It blinks reality to deny that the State struck Fields and Warren . . . because they were black. The strikes . . . occurred during a selection infected by shuffling and disparate questioning that race explains better than any race-neutral reason advanced by the State. The State's pretextual positions confirm Miller-El's claim, and the prosecutors' own notes proclaim that the Sparling Manual's emphasis on race was on their minds when they considered every potential juror." (*Id.* at p. 266.) Likewise, in *Snyder*, comparative juror analysis was an *additional* form of evidence considered by the Supreme Court in its review of the record. (*Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1211].)

The Supreme Court reiterated that reviewing courts must accord significant deference to the factual findings on the question of discriminatory intent. (*Snyder, supra*, 552 U.S. at pp. ___–___ [128 S.Ct. at pp. 1207–1208]; *Miller-El II, supra*, 545 U.S. at p. 240; *Miller-El I, supra*, 537 U.S. at pp. 339–340.) When an advocate's peremptory strike is challenged, the trial court must determine whether the advocate allowed his or her calculus to be infected by racial bias and then lied to the court in an attempt to get away with it. As a reviewing court, we presume the advocate uses peremptory challenges in a constitutional manner, and defer to the trial court's ability "to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*Wheeler, supra*, 22 Cal.3d at p. 282.)

It is the trial court which is best able to place jurors' answers in context and draw meaning from all circumstances, including matters not discernable from the cold record. As we emphasized in *People v. Johnson, supra*, 30 Cal.4th 1302: " '[T]he trial judge's unique perspective of voir dire enables the judge to have first-hand knowledge and observation of critical events. [Citation.] The trial judge personally witnesses the totality of circumstances that comprises the "factual inquiry," including the jurors' demeanor and tone

of voice as they answer questions and counsel's demeanor and tone of voice in posing the questions. [Citation.] The trial judge is able to observe a juror's attention span, alertness, and interest in the proceedings and thus will have a sense of whether the prosecutor's challenge can be readily explained by a legitimate reason. . . . [¶] The appellate court, on the other hand, must judge the existence of a prima facie case from a cold record. An appellate court can read a transcript of the voir dire, but it is not privy to the unspoken atmosphere of the trial court—the nuance, demeanor, body language, expression and gestures of the various players. [Citation.]' " (*Id.* at pp. 1320–1321, quoting *Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 683–684.)[17]

Under our deferential standard, we consider whether substantial evidence supports the trial court's conclusions. (*People v. Bonilla, supra*, 41 Cal.4th at pp. 341–342.) Evidence is substantial if it is reasonable, credible and of solid value. (*People v. Abilez* (2007) 41 Cal.4th 472, 504 [61 Cal.Rptr.3d 526, 161 P.3d 58]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) Comparative juror analysis is a form of circumstantial evidence. (See *Miller-El II, supra*, 545 U.S. at p. 241.) The law has long recognized that particular care must be taken when relying on circumstantial evidence. For example, jurors in criminal cases are instructed that before they can rely on circumstantial evidence to find a defendant guilty, they "must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." (Judicial Council of Cal. Crim. Jury Instns. (2006) CALCRIM No. 224.) This principle has been part of our jurisprudence since at least 1945. (See *People v. Bender* (1945) 27 Cal.2d 164, 174–176 [163 P.2d 8], overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 [96 Cal.Rptr.2d 441, 999 P.2d 666].)

The rationale behind the rule is that, unlike direct evidence, circumstantial evidence does not directly prove the fact in question. Instead, circumstantial evidence may support a logical conclusion that the disputed fact is true. But information may often be open to more than one reasonable deduction. Thus, care must be taken not to accept one reasonable interpretation to the exclusion of other reasonable ones. With regard to an appellate court's review of circumstantial evidence, we have observed: " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing

---

[17] *People v. Johnson* concerned the first *Wheeler/Batson* step—whether the defendant had established a prima facie case of discrimination. Nevertheless, we stated that concerns about the inability of a reviewing court to judge the dynamics of jury selection apply equally in assessing the prosecutor's credibility at the third *Wheeler/Batson* step. (*People v. Johnson, supra*, 30 Cal.4th at p. 1320.)

court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal.Rptr. 467, 760 P.2d 996].) This same principle of appellate restraint applies in reviewing the circumstantial evidence supporting the trial court's factual findings in a *Wheeler/Batson* holding.

### E. *The Trial Court's Ruling in This Case*

Defendant argues that the prosecutor's proffered explanations for exercising a peremptory challenge against C.A. were pretexts designed to disguise racial prejudice. The trial court found to the contrary. That finding is reasonable and supported by substantial evidence.

The prosecutor's first stated reason for challenging C.A. was her reaction to receiving a traffic ticket. When the prosecutor asked whether any of the prospective jurors ever had a "hostile, confrontational, [or] adverse" contact with law enforcement, C.A. was the lone panelist who raised her hand. In response to the prosecutor's question as to whether C.A. felt the officer was impolite, C.A. said, "Well, no one ever feels they deserve a ticket." She replied "yeah" when the prosecutor asked whether C.A. felt the officer "was shading the truth a little bit." When asked whether *she* felt she deserved the ticket, C.A. said, "I didn't know if I deserved [the ticket] or not, so I just went along with it."

In explaining his challenge, the prosecutor stated that while C.A. did not depict the incident as adversarial and "wanted to take the officer's word for it," he felt "there was probably a lot more to it than that."

■ By raising her hand to answer the prosecutor's question, C.A. necessarily identified the experience as negative. C.A. stated her belief that the officer had not been entirely truthful during the incident. "We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement." (*People v. Turner, supra,* 8 Cal.4th at p. 171; see *People v. Panah* (2005) 35 Cal.4th 395, 442 [25 Cal.Rptr.3d 672, 107 P.3d 790].) Moreover, C.A.'s answers could be fairly characterized as equivocal, supporting the prosecution's inference that C.A. was not completely forthcoming about the incident and may have harbored some resentment. Even though defendant characterizes C.A.'s answers as showing her respect for law enforcement by giving the officer the benefit of the doubt, possible contrary inferences do not undermine the genuineness of the prosecutor's explanation.

As to the prosecutor's second reason for excusing C.A, he noted that her "brother" had been killed 10 or 11 years earlier in a gang-related murder.[18] The prosecutor stated that it was his experience that "victims of gangs, not always by any means, but quite often are themselves gang members," and so he was concerned about "negative repercussions" for defendant's case.

Defendant complains that the prosecutor never confirmed that C.A.'s brother-in-law was a gang member, or explained how such an association would affect C.A.'s performance as a juror. However, the prosecutor was entitled to rely on this concern. Gang affiliation was at issue in the trial. Defendant was charged with a violation of carrying a loaded firearm in public while an active member of a criminal street gang (§ 12031, subd. (a)(2)(C)), and the venire panel was advised that "there's going to be some gang evidence."[19] As the Court of Appeal stated: "The prosecutor's concern about possible 'negative repercussions' of the gang-related homicide in C.A.'s family arose from his own experience that victims of gangs tend to be members of gangs. Like his trepidation about her negative experience with law enforcement, his wariness about a possible family gang connection was comprehensible, neither discriminatory nor implausible, and at variance with nothing in the record." An advocate is permitted to rely on his or her own experiences and to draw conclusions from them. We have recognized that even hunches and idiosyncratic reasons may support a peremptory challenge. (*People v. Turner, supra,* 8 Cal.4th at p. 165.) As noted above, the question is not whether a different advocate would have assessed the risk differently, but whether this advocate was acting in a constitutionally prohibited way.

Additionally, defendant argues that the timing of the prosecutor's challenge to excuse C.A. is "suspicious" because it followed the striking of Black panelist L.F. by defense counsel, thereby resulting in no Blacks serving on the jury. However, the prosecutor had accepted the panel when it contained L.F. At the *Wheeler/Batson* hearing, the prosecutor advised that "he would have been fine" with L.F. on the jury. The prosecutor's representation finds support in the record. L.F. stated in voir dire that he was a boyhood friend of one of the officers listed as a witness in the case, and played sports with Curtis Rufus, the victim of the attempted murder. The prosecutor's acceptance of the panel containing a Black juror strongly suggests that race was not a motive in his challenge of C.A. (*People v. Kelly* (2007) 42 Cal.4th 763, 780 [68 Cal.Rptr.3d 531, 171 P.3d 548]; *People v. Cornwell* (2005) 37 Cal.4th 50, 69–70 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

---

[18] The prosecutor misspoke. C.A.'s brother-in-law was killed by gang members.

[19] Defendant later stipulated to being an active participant in a street gang and aiding and abetting members of that gang in committing crimes.

An analysis of the record demonstrates that substantial evidence supports the trial court's finding that the prosecutor's proffered reasons were not pretextual. Defendant's reliance on comparative juror analysis does not undermine this conclusion. The Court of Appeal, relying on our practice enunciated in *People v. Johnson, supra*, 30 Cal.4th at page 1322, declined defendant's request to conduct a comparative juror analysis. Consistent with our conclusion regarding the effect of *Miller-El II, supra*, 545 U.S. 231, and *Snyder, supra*, 552 U.S. at page ___ [128 S.Ct. 1203], we undertake that comparison here. It does not demonstrate purposeful discrimination.

Defendant compares C.A. to Juror No. 482753, one of the four Hispanics seated on the jury. Juror No. 482753 described an incident two years earlier in which he and his brother took away their mother's car keys because she had been drinking and wanted to drive. The juror explained that his mother called the police, who responded and "saw that my mother was drunk, so they assumed we had been drinking." The officers told the juror and his brother to return the keys, but they refused. The brother stepped forward and explained that they were not trying to cause problems. One of the officers pulled out his club and told the brothers they would be sprayed with Mace if they did not return the keys. The juror said there were two or three officers present and he thought the police "were getting a little too crazy." When the court inquired of his present feelings about the incident, the juror responded, "I was about ready to write a letter to the editor. I could have smeared them pretty bad, but I chose not to do it." The juror explained, "I figured they're trying . . . to handle that situation without getting hurt." The juror told the court he could set aside the incident and not allow it to impact his deliberation in defendant's case.

Defendant complains that Juror No. 482753's dissatisfaction with the police concerning this incident is far more significant than C.A.'s comments about getting a traffic ticket. However, the prosecutor's hesitation regarding C.A. was based on his sense of her possible lingering resentment. On the other hand, Juror No. 482753 stated that he realized that the police were acting out of concern for their safety and so he did not complain about their conduct. Contrary to defendant's assertion, these two panelists were not similarly situated on this issue.

Juror No. 482753 also stated that his cousin shot and killed someone when he was 16 years old. The cousin was convicted and "had to go to jail," but "[h]e's out now, and he's doing great." The juror stated that his cousin was treated fairly by the police and courts, and "it was a bad situation, but it turned out to be a good situation for him." Defendant argues that the prosecutor apparently was not concerned that Juror No. 482753's cousin might be a gang member because he never asked about gang status. But in

light of the juror's comments about his cousin's past experience and present circumstances, the prosecutor could have found such question unnecessary.

Further, Juror No. 482753 stated that he was a high school acquaintance of one of the police officers identified as a potential witness in defendant's case. The juror described the officer as "a really good guy." This factor would likely have been significant in the prosecutor's decision to retain the juror and further distinguishes this juror from C.A. The prosecution's acceptance of this juror demonstrates another aspect of jury selection. While an advocate may be concerned about a particular answer, another answer may provide a reason to have greater confidence in the overall thinking and experience of the panelist. Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so.[20]

▌ Defendant attempts to compare C.A. with panelist E.T., who was in the second group of 21 panelists questioned. During questioning of panelists by the court, E.T. stated that his son was "accused of being a gang member, and he was exonerated." Defendant argues that despite this information, the prosecutor apparently did not have the same concerns about E.T. that he had about C.A. Defendant's argument is speculative. E.T. was never designated as one of the 13 prospective jurors subject to peremptory strikes, and thus we have no idea whether the prosecutor would have kept or challenged E.T. This aspect of review compares panelists who were struck with those who were allowed to serve or were passed by the prosecution before being ultimately struck by the defense. (See *Miller-El II, supra,* 545 U.S. at pp. 241 & 245, fn. 4.)

Finally, we note that in examining the entire record, there is no other evidence that the prosecution's challenges were improperly based on race. There is no indication that the prosecutor or his office relied on racial factors. There is no evidence of procedural manipulation, deceptive questioning, or any of the other signs of constitutional violation like those present in *Miller-El II.* Based on the totality of the evidence, the prosecutor's stated reasons for excusing C.A. are fully supported. Defendant has failed to demonstrate those reasons were not genuine.

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

---

[20] Additionally, we observe that the prosecutor's decision not to exercise a peremptory challenge against this Hispanic juror undermines defendant's trial court claim that the prosecutor improperly excluded minority panelists. (*People v. Kelly, supra,* 42 Cal.4th at p. 780; *People v. Cornwell, supra,* 37 Cal.4th at pp. 69–70.)

**BAXTER, J., Concurring.**—I concur in the majority opinion. I write separately, however, to emphasize two points. First, the United States Supreme Court appears to have reserved the issue whether reliance on comparative juror analysis may be deemed procedurally defaulted if not raised at trial. Second, if the high court were to subsequently hold that state courts may enforce a procedural default rule as such, nothing in today's majority opinion would preclude this court from doing so in the future.

In *Snyder v. Louisiana* (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203] (*Snyder*), the United States Supreme Court conducted a comparative juror analysis as part of its evaluation of the petitioner's claim that the prosecution impermissibly used a peremptory challenge to exclude a prospective juror on the basis of race. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); see *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) In conducting the analysis, despite the fact that none had been requested or performed at trial, the high court stated in a footnote: "The Louisiana Supreme Court did not hold that petitioner had procedurally defaulted reliance on a comparison of the African-American jurors whom the prosecution struck with white jurors whom the prosecution accepted. On the contrary, the State Supreme Court itself made such a comparison. See [*State v. Snyder* (La. 2006)] 942 So.2d 484, 495–496 . . . ." (*Snyder, supra,* 552 U.S. at p. \_\_\_, fn. 2 [128 S.Ct. at p. 1211, fn. 2].)

As the majority observes, the meaning of the *Snyder* footnote is unclear, and it does not necessarily suggest the United States Supreme Court would honor a state procedural rule requiring that comparative juror analysis be conducted first in the trial court or be deemed defaulted or forfeited. (Maj. opn., *ante,* at p. 620, fn. 14.) Nonetheless, the footnote may reasonably be viewed as reflecting the high court's intent to reserve this issue for future decision.

In the event the Supreme Court were to defer to state courts that impose a procedural bar when a defendant relies on comparative juror analysis for the first time on appeal, it bears emphasis that our decision today, which follows the high court's lead in *Snyder, supra,* 552 U.S. 472 [128 S.Ct. 1203], and *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317], would not hinder our future consideration and application of a procedural default rule.

In this regard, the majority identifies a number of valid and pragmatic considerations that support application of a procedural default rule in cases

where the defendant fails to request a comparative juror analysis at trial. Most notably, " 'a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.' " (Maj. opn., *ante*, at p. 620, quoting *Snyder, supra*, 552 U.S. at p. ___ [128 S.Ct. at p. 1211].) Indeed, even if the trial court happens to conduct a reasonably thorough exploration of the subject matter as to which similarities are alleged, there are a variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar, for example, " '[T]he particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box.' " (Maj. opn., *ante*, at p. 623, quoting *People v. Johnson* (1989) 47 Cal.3d 1194, 1220 [255 Cal.Rptr. 569, 767 P.2d 1047].) When a comparative juror analysis is undertaken for the first time on appeal, the record is likely to reflect none of these other considerations.

Moreover, requiring a defendant to seek a comparative analysis at trial promotes the policy of judicial economy and fairness in at least two ways. First, if the defendant perceives that certain unchallenged jurors are similarly situated to prospective jurors who were challenged, then alerting the trial court to that state of affairs would permit the court to take immediate curative action and avoid the time and expense of reversal and retrial if it finds the defendant's complaint meritorious. (See *Watkins v. State* (Tex.Crim.App. 2008) 245 S.W.3d 444, 457–458 (conc. opn. of Keller, P. J.).) Second, a trial court that is called upon to conduct a comparative analysis could ensure that the prosecution is afforded a fair opportunity both to state its reasons for challenging a prospective juror and to explain its failure to challenge any alleged similarly situated jurors. This minimizes the prospect of appellate speculation in the evaluation of a *Wheeler/Batson* claim. (See *Watkins*, at p. 458.)

In sum, the United States Supreme Court has not yet addressed whether a state court may deem a defendant procedurally barred on appeal from relying on juror comparisons to support a *Wheeler/Batson* third-stage claim, if the defendant did not rely on such comparisons at trial. Given this circumstance, I fully agree that, for the time being, we should view the high court's recent decisions as requiring reviewing courts to perform comparative juror analysis if requested and if the record is adequate to permit comparisons, even when such an analysis was not conducted at trial.

Chin, J., concurred.

**MORENO, J.,** Concurring.—I agree with the majority that appellate courts should, under appropriate circumstances, engage in comparative juror

analysis as a means of detecting the discriminatory use of peremptory challenges in violation of *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] and *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]. *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] and *Snyder v. Louisiana* (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203] (*Snyder*) teach us implicitly that however problematic it may be to conduct such comparative analysis for the first time on appeal, it is even more problematic to categorically refuse to conduct such analysis, thereby permitting some *Wheeler/Batson* violations to go undetected. Indeed, because those who discriminate rarely admit to discrimination, comparative analysis has been widely used in a variety of fields to ferret out the unlawful discrimination that hides behind pretext. (See, e.g., Schwemm, Housing Discrimination: Law and Litigation (2007 ed.) § 32.2, pp. 32-4 to 32-5 [noting the common use of Black and White "testers" to determine whether Black renters and home buyers are subject to discrimination].) It is therefore unsurprising the United States Supreme Court has employed the use of such comparative analysis as a means of detecting unlawful exclusion of persons from jury service on the basis of race. I write separately to clarify the circumstances under which such comparative analysis is appropriate.

The United States Supreme Court recently emphasized that the deference appellate courts should accord to trial court decisions regarding *Batson* challenges "is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." (*Snyder, supra,* 552 U.S. at p. ___ [128 S.Ct. at p. 1209].) As the majority convincingly explains, peremptory challenges may turn upon perceptions not available to someone reading the cold record—the tone of voice, facial expression, body language, etc., of the prospective juror. When a trial judge validates a prosecutor's challenge based on the prospective juror's demeanor, and makes clear that such demeanor is the primary reason for validating the challenge, then it is difficult to imagine any circumstance under which an appellate court would second-guess that judgment.

On the other hand, when the challenge is made based on factors other than demeanor, or, in the case of *Snyder*, the challenge is based both on demeanor and nondemeanor considerations, and the trial court does not state or imply on the record that the challenge based on demeanor is credible, then appellate courts may use comparative juror analysis to test the validity of the prosecutor's proffered challenges, comparing the supposedly objectionable characteristics of the rejected prospective juror with the characteristics of seated jurors. (*Snyder, supra,* 552 U.S. at pp. ___–___ [128 S.Ct. at pp. 1209–1213].) Such analysis, often in combination with other indications of bias, such as the inherently dubious nature of the explanation for the challenge, or an apparent

pattern of excluding minority jurors, may be a legitimate basis for an appellate court's conclusion that there was a *Wheeler/Batson* violation in the court below. (*Ibid.*)

In the present case, as the majority recounts, one reason the prosecutor gave for peremptorily challenging Prospective Juror C.A. is that her brother-in-law had been killed 10 or 11 years earlier in a gang-related murder and that this could have meant that her brother-in-law was himself a gang member, although the prosecutor made no inquiry to confirm that. Defendant challenges the inherent dubiousness of this reasoning, buttressing his argument by pointing to the possible gang affiliation of Juror No. 482753's cousin, who had shot and killed someone when he was 16 years old. Were it the case that the prosecutor's only reason for excluding C.A. was her brother-in-law's possible gang affiliation, I might agree with defendant's argument. However, as the majority explains, other reasons for excluding C.A., most particularly the fact that she was the only one to raise her hand in response to the question of whether a prospective juror had a hostile, confrontational or adverse contact with law enforcement, provide sufficient justification for the peremptory challenge. Moreover, like the majority, I agree that Juror No. 482753 demonstrated a more positive attitude toward law enforcement, thereby undermining defendant's argument that he was comparable to C.A. On this basis, I concur in the judgment.

Appellant's petition for a rehearing was denied September 24, 2008. Corrigan, J., did not participate therein.