Filed 5/30/13  P. v. Pontod CA3
Opinion following rehearing

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MANUEL RAY PONTOD et al.,<br><br>Defendants and Appellants. | C065925<br><br>(Super. Ct. Nos. SF112457A & SF112457B) |

This opinion follows our January 7, 2013 order granting defendant's petition for rehearing and vacating our prior opinion in this matter. (*People v. Pontod* (Dec. 18, 2012, C065925) [nonpub. opn.]; Cal. Rules of Court, rule 8.268(d).)

A jury convicted defendants Manuel Ray Pontod and Jorge Jaime of each being a felon in possession of a firearm, and of the unlawful possession of ammunition. The jury also convicted Jaime of transporting methamphetamine, possessing methamphetamine for sale, and possessing a controlled substance with a loaded, operable firearm. In addition,

1

the jury found that Jaime was armed in the commission of the offenses for transportation and possession of methamphetamine.  The trial court found Pontod had two prior strike convictions and had served a prior prison term.  It sentenced Pontod to a term of 25 years to life in state prison, and sentenced Jaime to a term of seven years and eight months in state prison.

On appeal, Pontod asserted:  the trial court erred in denying his *Batson/Wheeler* motion (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); his conviction for being a felon in possession of a firearm is not supported by substantial evidence; and the trial court abused its discretion in denying his motion to dismiss one of the prior strike allegations.

In addition, Jaime asserted:  his punishment for being a felon in possession of a firearm and for being armed while transporting methamphetamine violates the prohibition against multiple punishment in Penal Code section 654;[1] and his conviction for possessing a controlled substance while armed with a firearm must be reversed because there is no substantial evidence that the firearm was operable.

In our original opinion, we rejected defendants' claims, concluding:  (1) the trial court did not err in denying Pontod's *Batson/Wheeler* motion because there was no proof by a preponderance of the evidence that a prospective juror had been removed based on race; (2) there is substantial evidence that Pontod possessed one of the guns in the car; (3) the trial court did not abuse its discretion in denying Pontod's motion to dismiss one of the prior strike allegations; (4) Jaime's sentence does not violate section 654; and (5) there is substantial evidence that Jaime was armed with an operable firearm.

Pontod filed a petition for rehearing, arguing that he is entitled to the benefit of Proposition 36, which was approved by the voters on November 6, 2012 and modifies the

---

[1] Undesignated statutory references are to the Penal Code.

2

three strikes law. He asked us to vacate his sentence and remand the matter for a new sentencing hearing. We vacated our original opinion in order to address Pontod's contention. We continue to reject defendants' original contentions. We also conclude that Pontod is not entitled to a remand for a new sentencing hearing for the reasons explained in *People v. Conley* (2013) ___ Cal.App.4th ___ [2013 WL 1833251] (*Conley*). Accordingly, we will affirm the judgments.

## BACKGROUND

California Highway Patrol Sergeants Crutchfield and Languemi saw a Camaro fishtail around a street corner one evening in 2009. They stopped the Camaro, and Sergeant Crutchfield walked toward the driver's door while Sergeant Languemi walked toward the passenger side. Kurt Nagle was in the driver seat, Jaime was in the front passenger seat, and Pontod was in the right rear passenger seat. They were all moving around, and Pontod looked like he was trying to cover something up on the floorboard.

As Sergeant Crutchfield neared the car, Nagle opened the driver's door and began to get out. Crutchfield told him to stay in the car, and asked for his license, registration, and proof of insurance. Nagle appeared extremely nervous and his hands were shaking. Crutchfield saw Pontod trying to cover up a case of beer in the rear of the car. Crutchfield told Nagle, "Tell your friends that I can see the beer and to stop moving around." Because Crutchfield could smell alcohol, he had Nagle get out and escorted him toward the front of the patrol car.

Sergeant Languemi, who was standing at the right rear side of the Camaro, turned on his flashlight and illuminated the inside of the vehicle. He saw the handle of a .44 caliber revolver at Pontod's feet, and saw Pontod "making a motion like trying to kick it forward." Languemi drew his own gun and watched to make sure that Pontod did not reach for the revolver in the car. Languemi did not immediately tell Crutchfield because he did not want to alert the occupants of the car to the fact that he had seen the weapon. However, as Crutchfield escorted Nagle toward the patrol car, Languemi told him to

3

handcuff Nagle and put him in the backseat. Crutchfield asked why, and Languemi replied, "[r]ight rear has a gun." The two officers waited for backup to arrive and then handcuffed Pontod and Jaime before placing them in patrol cars.

A search of the Camaro revealed three handguns: a loaded .25 caliber semiautomatic tucked between the driver's seat and the center console near the seatbelt release; a loaded .38 Special revolver concealed underneath the front part of the front passenger's seat; and a loaded .44 caliber revolver underneath the rear portion of the right front passenger seat. A plastic bag containing a large quantity of methamphetamine was inside a case of beer on the rear passenger seat. A box of .44 caliber ammunition was also on the rear passenger seat underneath a fast food bag.

Jaime testified that he alone possessed the guns and methamphetamine, and that neither Nagle nor Pontod knew about the contraband. Jaime stated that on the night in question, he began having car trouble and managed to drive to the nearby Pontod family paint shop to call a tow truck. Pontod was there and Jaime spoke to him briefly before Nagle happened to arrive. Either Nagle or Pontod asked if Jaime needed a ride. Because Jaime did not have a place to live, he kept his guns, ammunition and drugs in his car. He grabbed these items, and surreptitiously put them in his pockets and front waistband, before getting into the front seat of Nagle's car. As they were driving, Jaime pretended to tie his shoes. He pulled the .44 caliber gun from his waistband in his "crotch area," and "threw it back," which meant he shoved the gun under the front seat and pushed it towards the back. Jaime stated he discreetly pulled the .38 caliber revolver from his right pocket and put it under the same seat. He left the remaining .25 caliber gun in his pocket and put the ammunition, which was in a McDonald's bag, on the floor. When the police pulled them over, Jaime got nervous and threw the McDonald's bag in the backseat. He quickly stuffed the methamphetamine in the case of beer. When the officers took Nagle to the patrol car, Jaime grabbed the .25 caliber gun and stuffed it between the driver's seat and center console.

4

Jaime testified he bought the guns a few months earlier. He bought the .44 caliber revolver for protection. Then he purchased the .25 caliber semiautomatic weapon because he "thought it was cool at the time, you know, just -- I don't -- there's no reason for it but protection again." Jaime thought it was "cool to have a gun in general." He said he purchased the .38 revolver at the same time as the .25 semiautomatic because it was a "packaged deal."

The jury acquitted Nagle of all charges, but convicted Pontod and Jaime of each being a felon in possession of a firearm (former § 12021, subd. (a)), and of unlawful possession of ammunition (former § 12316, subd. (b)(1)). The jury also convicted Jaime of selling or transporting methamphetamine (Health & Saf. Code, § 11379), possessing methamphetamine for sale (Health & Saf. Code, § 11378), and possessing a controlled substance with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a)). In addition, the jury found that Jaime was armed with a firearm in the commission of the offenses for transportation and possession of methamphetamine (§ 12022, subd. (c)). The trial court found Pontod had two prior strike convictions and had served a prior prison term (§§ 667, subds. (b)-(i), 667.5, subd. (b)).

## DISCUSSION

### I

Pontod contends the trial court erred by denying his *Batson/Wheeler* motion. The motion was based on the prosecutor's peremptory challenge of Prospective Juror T.J., who is African-American.

It is a violation of the United States and California Constitutions for a prosecutor to use peremptory challenges to strike prospective jurors on the basis of group membership or bias. (*Batson, supra,* 476 U.S. at pp. 84-89 [90 L.Ed.2d at pp. 79-83]; *Wheeler, supra,* 22 Cal.3d at pp. 276-277.) In bringing a *Batson/Wheeler* motion, " ' "the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] [O]nce the

5

defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] '[I]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" ' [Citations.]" (*People v. Vines* (2011) 51 Cal.4th 830, 848.)

Here, the trial court found that defendant made a prima facie showing, so the burden shifted to the prosecutor to explain his conduct by providing "a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause,* and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. [Citation.] Certainly a challenge based on racial prejudice would not be supported by a legitimate reason." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).)

"At the third stage of the *Wheeler*/*Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*Lenix, supra,* 44 Cal.4th at p. 613, fn. omitted; accord, *People v. Jones* (2011) 51 Cal.4th 346, 360.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] . . . So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix, supra,* 44 Cal.4th at pp. 613-614.)

In this case the prosecutor challenged T.J., who was single, worked as a "warehouse person" and had never served as a juror on a criminal trial. When one of the defense attorneys asked T.J. "what sort of things [he did] socially on a weekend evening," he replied, "Most of the time I'll be at work. That's where I'll be." Thereafter, T.J. informed the prosecutor he worked 40 hours during the week and then worked most weekends. He worked "a lot." The prosecutor asked what T.J. did in his off time, and he replied he would visit his parents or "[j]ust rest, really." The prosecutor asked if he had any hobbies, and T.J. replied, "Yeah. I draw, computers. That's it."

After the prosecutor peremptorily challenged T.J., Pontod's attorney made a *Batson/Wheeler* motion on the basis that T.J. was the third African-American to be excused. Defense counsel acknowledged that the first juror had been removed for cause, but there was no reason for removing the second juror, M.M., or the third, T.J.

The trial court observed there were two African-Americans in the jury box, one of them being T.J., and noted that Pontod and Jaime appeared to be Hispanic and Nagle appeared to be Caucasian. It found a prima facie case had been made and asked the prosecutor to state his reasons for excusing T.J.

The prosecutor replied that T.J. was single, appeared to be young, spent a great deal of time working, and seemed to be a loner given his solitary hobbies. Had T.J. indicated he liked hobbies involving other people it might have been different, but the prosecutor had been observing him and "he did not communicate very well with anyone

7

else.  He was just sitting there."  The prosecutor explained, "People who spend their time alone do not mix well in a jury.  They are usually the lo[ne] hold-outs and that is the reason.  It does not have anything to do with his race."

The other jurors challenged by the prosecutor were also youthful or single and lacked jury experience, a stake in the community, or social connections.  This included M.M., the other African-American prospective juror he challenged, who was young, single, had no children, no prior jury experience, and arrived late.

Defense counsel responded that the prosecutor asked T.J. about his hobbies, but did not ask others similar questions to see if they were loners.  Moreover, some of the people the prosecutor excused were not young or loners, so he did not have a pattern of excusing young people.

The prosecutor replied that he did not justify his challenges by stating that he only excused young people, however he "certainly kicked out all the young people . . . ."  Moreover, he only asked questions about hobbies when he believed that the prospective juror did not have roots in the community.  His challenges were based on those he believed did not have "a stake in the community."

The trial court denied the motion, finding that the preponderance of the evidence did not demonstrate that T.J. was removed for an invalid reason such as his race.  Rather, the reasons provided by the prosecutor and "the totality of the circumstances" supported the decision to remove him.

Pontod contends the trial court did not make a sincere and reasoned attempt to evaluate the prosecutor's explanation by conducting a comparative juror analysis to see if the reasons given for excusing T.J. applied to non-African-American jurors who were permitted to serve.  We disagree.

"[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination. . . . Thus, evidence of comparative juror analysis must be considered in the trial court and

8

even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons." (*Lenix, supra,* 44 Cal.4th at p. 622.) However, "comparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard. . . . Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent. [Citation.] Additionally, appellate review is necessarily circumscribed. The reviewing court need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment. Further, the trial court's finding is reviewed on the record as it stands at the time the *Wheeler/Batson* ruling is made. If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments." (*Id.* at p. 624.)

The trial court carefully considered the reasons given by the prosecutor for excusing T.J. and M.M., and whether these same reasons applied to the handful of prospective jurors singled out by defense counsel as being similarly situated. Substantial evidence supports the trial court's decision.

At the time Pontod made his *Batson/Wheeler* motion one other African-American was in the jury box, who ultimately served on the jury. Another African-American was selected to serve as an alternate. This supports the prosecutor's assertion he did not excuse T.J. because he was African-American. " 'While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories . . . .' [Citation.]" (*People v. Ward* (2005) 36 Cal.4th 186, 203.)

9

The record indicates that life experience was important to the prosecutor. He said, "I apologize to you in advance, those of you who look very youthful, I am going to pick on you a little bit." He asked certain jurors when they graduated from high school. A juror's youth or limited life experience is a valid reason for a peremptory challenge. (*People v. Gonzales* (2008) 165 Cal.App.4th 620, 631.)

The prosecutor used his first challenge to excuse Prospective Juror V.R., who was young, single, had no children, had never been on a jury and, like T.J, worked in a warehouse. He used his second challenge to excuse Prospective Juror A.L., who was young, single, had no children, went to school but had not graduated from high school, did not work, and did not watch the news or read newspapers. The third challenge was to Prospective Juror M.M., who was young, single, had no children, had never been on a jury, and worked at JCPenney. The prosecutor used his fifth challenge to excuse Prospective Juror K.M., who was young, single, had no children, had never been on a jury, and worked as a receptionist. The prosecutor used his seventh challenge against Prospective Juror S.J. who was not young but was single, had no children and was an unemployed facility maintenance worker. All of these challenges were consistent with the prosecutor's justification for excusing T.J., who appeared to be young and did not have strong social connections or a stake in the community.

Pontod contends that other jurors who served on the jury lacked a social life or ties to the community, but two of the only three jurors identified by him had been married and either had children or socialized with friends. The prosecutor could reasonably conclude that marriage, child care and friends all indicate social connectedness and a stake in the community.

The third juror, No. 12, was not married and did not have children. But because defense counsel did not ask the prosecutor to explain why he did not challenge Juror No. 12, minimal information is available in the appellate record from which to conduct a comparative analysis. We cannot discern whether the person was older and more mature,

which would fit the prosecutor's asserted preference for jurors with more life experience. Nonetheless, the record reflects that the juror had a cousin who was jailed for a drug offense and that the juror felt the cousin was treated fairly. The juror said, "He made a choice," and noted that he eventually overdosed and died. The prosecutor may have concluded that Juror No. 12 was not favorably disposed to drug offenders and believed that people have to accept the consequences of their choices.

Under the circumstances, Pontod's comparative analysis claim fails. The trial court did not err in denying the *Batson/Wheeler* motion.

II

Pontod next contends his conviction for being a felon in possession of a firearm must be reversed because there is no substantial evidence that he possessed any of the guns in the vehicle.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Pontod maintains that all of the guns belonged to Jaime and that Pontod's mere proximity to a weapon is not sufficient to establish constructive possession; he must have knowingly exercised dominion and control over a weapon. For example, in *People v. Sifuentes* (2011) 195 Cal.App.4th 1410 (*Sifuentes*), there was insufficient evidence of constructive possession of a weapon where (a) the defendant was in a motel room with another gang member, (b) a gun was found under the mattress closest to the other gang

11

member, and (c) the prosecution asserted the defendant had dominion and control over the weapon based on his gang membership and the understanding among gang members that a gun is available for shared use by all members of the gang. (*Id*. at pp. 1413-1414, 1417-1419.)

But here, unlike in *Sifuentes*, the prosecution did not rely on an inference that Pontod shared possession of the weapons in the car based on gang affiliation. Rather, the theory was that he possessed the .44 caliber revolver found under the passenger seat in front of him. One of the officers who searched the car testified that the mechanism under the seat created a barrier between the front and the back, which undermined Jaime's claim that he pushed one of the guns back under the seat toward Pontod. The .38 Special was found where Jaime hid it in front of the barrier, but the .44 caliber revolver was found behind the barrier nearer to Pontod. Sergeant Languemi saw Pontod appear to kick the weapon under the seat in front of him in an effort to hide it. In addition, ammunition for the .44 caliber weapon was found in an area of the backseat next to Pontod. This amply supports an inference that Pontod possessed the .44 caliber revolver, and that he exercised dominion and control over it. Substantial evidence supports his conviction.

### III

Pontod further contends the trial court erred in denying his *Romero*[2] motion to dismiss one or both of his prior strike allegations pursuant to section 1385. He argues he falls outside the spirit of the three strikes law due to his youthful age, the decreasing seriousness of his offenses, and the fact no one was hurt in the present case.

A trial court has discretion under section 1385 to dismiss a prior strike allegation, but dismissal of a strike is a departure from the sentencing norm. (*People v. Carmony* (2004) 33 Cal.4th 367, 376 (*Carmony*).) The trial court has discretion to do so only if the

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

defendant falls outside the spirit of the three strikes law.  (§ 1385; *People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*); *Romero*, *supra,* 13 Cal.4th at pp. 529–530.)  In exercising its discretion, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (*Williams, supra,* 17 Cal.4th at p. 161.)

A trial court's ruling on a motion to dismiss a prior strike is reviewed for abuse of discretion.  (*Carmony, supra,* 33 Cal.4th at p. 375.)  A defendant has the burden of establishing that the trial court's denial of the motion was arbitrary or irrational, such as where the trial court was not aware of its discretion, considered impermissible factors, or imposed a sentence that is absurd under the particular facts of the case.  (*Id.* at pp. 376–377.)

In reaching its decision in this case, the trial court employed the factors required under *Williams* by considering the nature and circumstances of the present felony conviction and the prior strike, along with Pontod's background, character, and prospects. In October 2003, when Pontod was 18, he beat up a random person and stole his wallet. He was convicted of robbery in January 2004.  Less than one year later, while Pontod was on probation, he made a terrorist threat and was in possession of a firearm in violation of former section 12021.  He was sentenced to prison, was paroled in 2007, and violated his parole the same year and again in 2008.  Pontod was still on parole when he committed the present offense.  And, while incarcerated for the present offense, he was subject to 14 incident reports in jail for such things as disobeying housing guidelines, being in unauthorized areas, disorderly conduct, fighting, and actions endangering inmates and staff.  The trial court did not abuse its discretion in observing that "[n]othing in [Pontod's] history shows me that he has changed his behavior or his prospects.  The

Court still considers him to be a threat to society. It's unfortunate he picked these up right in a row at a very young age, but he does not fall outside the spirit of the three strikes laws . . . ."

Pontod's argument does not show that the trial court failed to consider the appropriate factors, only that he disagrees with the trial court's weighing of various factors. This is not an appropriate basis on which to find an abuse of discretion. (*Carmony, supra*, 33 Cal.4th at p. 379.) Pontod has not met his burden of showing that the trial court's decision was so irrational or arbitrary that no reasonable person could agree with it. (*Id.* at p. 377.)

IV

The trial court sentenced Jaime to three years in prison for selling or transporting methamphetamine, four years on the enhancement for being armed in the commission of the offense, and a consecutive eight months for being a felon in possession of a firearm. Jaime contends the sentence for being a felon in possession of a firearm violates section 654 and must be stayed. We disagree.

"Section 654 . . . ' "precludes multiple punishment for a single act or for a course of conduct comprising indivisible acts. 'Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor.' [Citations.] '[I]f all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once.' [Citation.]" [Citation.]' . . . [¶] Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).)

" ' "Whether a violation of [former] section 12021, forbidding persons convicted of felonies from possessing firearms . . . constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each

14

individual case. Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense." ' [Citations.]" (*Jones, supra,* 103 Cal.App.4th at pp. 1143-1144.) "It is clear that multiple punishment is improper where the evidence 'demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense . . . .' [Citation.]" (*Id.* at p. 1144.) "On the other hand, it is clear that multiple punishment is proper where the evidence shows that the defendant possessed the firearm before the crime, with an independent intent." (*Ibid.*)

Here, the evidence did not demonstrate that fortuitous circumstances put the firearms in Jaime's possession only at the instant of committing the methamphetamine offenses. Rather, Jaime testified that he purchased the guns several months earlier for protection and because it was cool to own guns. He did not purchase the methamphetamine until the day before the traffic stop. Thus, by his own admission, the crime of being a felon in possession of a firearm was completed well before he purchased the methamphetamine and armed himself with his weapons to protect his drugs. Jaime is not being punished twice for the same act; there is no violation of section 654. (*People v. Vang* (2010) 184 Cal.App.4th 912, 917.)

V

Jaime challenges the sufficiency of the evidence to support his conviction for violating Health and Safety Code section 11370.1, subdivision (a), which requires proof not only of possession of a controlled substance, but that he was armed simultaneously with a loaded, operable firearm. (*People v. Peña* (1999) 74 Cal.App.4th 1078, 1082.) Jaime concedes that the guns were loaded, but contends there was no evidence that they were operable.

15

Proof of operability can be established by circumstantial as well as direct evidence. (*People v. Smith* (1974) 38 Cal.App.3d 401, 410 (*Smith*); see also, *People v. Catlin* (2001) 26 Cal.4th 81, 142 [circumstantial evidence may constitute substantial evidence of guilt].) In *Smith, supra,* 38 Cal.App.3d 401, the court specifically rejected the need for direct evidence of operability, concluding: "The circumstantial evidence that the weapon was operable was more than sufficient: Defendant was armed with a shotgun during the robbery. When he was arrested, a loaded shotgun and additional shotgun shells were found in the vehicle in which he was riding. A jury could easily infer that defendant would not have carried a loaded shotgun with additional shells, if the weapon were inoperable." (*Id*. at p. 410.)

As in *Smith*, the jury in this case could draw the necessary inference of operability. Jaime testified that he bought the guns for protection, which indicates that the weapons were operable since inoperable ones would have little use for this purpose. It is not logical that Jaime would have loaded guns in the car to protect his methamphetamine if the guns were inoperable. Substantial circumstantial evidence supports a reasonable and logical inference that all of the weapons were operable.

VI

After we filed our decision in this case, Pontod filed a petition for rehearing seeking the benefit of the change in law enacted by Proposition 36. Pontod was sentenced to 25 years to life under the three strikes law for a crime that was not a serious or violent felony. Proposition 36 limits three strikes sentences to current convictions for serious or violent felonies, or a limited number of other felonies not relevant here. (See §§ 1170.12, subd. (c), 667, subd. (c).) If Pontod had been sentenced today, he would not be subject to a 25-to-life three strikes sentence. He asked us to vacate his sentence under the three strikes law and remand the matter to the trial court for a new sentencing hearing.

In asking us to vacate his sentence and remand the matter, Pontod relies on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), in which the California Supreme Court held that

16

absent a "saving clause," a criminal defendant whose judgment is not yet final is entitled to the benefit of a statutory change imposing a lighter punishment for the defendant's criminal act. (*Id*. at pp. 744-745, 747-748.) We rejected an identical challenge in *Conley, supra,* ___ Cal.App.4th ___ [2013 WL 1833251]. Nothing in Pontod's petition persuades us to alter our opinion in *Conley*. For the reasons expressed in *Conley*, Pontod is not entitled to have his sentence vacated and the matter remanded for resentencing; his recourse is to petition for a recall of sentence under section 1170.126.

DISPOSITION

The judgments are affirmed.

            MAURO           , J.

We concur:

         ROBIE         , Acting P. J.

        MURRAY        , J.