Filed 12/22/21  P. v. Gordon CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C086934 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE009146) |
| v. | |
| ALBERT JEROME GORDON, | |
| Defendant and Appellant. | |

A jury found defendant Albert Jerome Gordon guilty of multiple crimes related to the possession for sale of cocaine and marijuana and the unlawful possession of a firearm.  In a bifurcated proceeding, the trial court found true the enhancement that defendant served one prior prison term under Penal Code section 667.5, subdivision (b) (statutory section citations that follow are to the Penal Code unless otherwise stated).  On appeal, defendant contends:  (1) we must independently review the sealed transcript of the in-camera hearing pursuant to *Pitchess v. Superior* Court (1974) 11 Cal.3d 531 to determine whether the trial court abused its discretion in refusing to disclose any potentially relevant personnel records of three police officers; (2) the trial court erred in denying his claim that the prosecutor impermissibly relied on race during jury selection in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); and (3) the trial court abused its discretion in admitting photographs he alleges depicted him with

1

cash and guns, under Evidence Code section 352.  Additionally, defendant contends in supplemental briefing, and the Attorney General concedes, that the prior prison term enhancement must be stricken from his sentence because he is entitled to the benefits of Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1) (Senate Bill 136), which became effective on January 1, 2020, during the pendency of the current appeal.

We will direct the trial court to strike defendant's prior prison term enhancement. We otherwise affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

On May 7, 2016, during the execution of a search warrant at defendant's residence on Center Parkway, officers found eight cell phones, $300 in cash, and a sock containing an empty Glock extended-capacity handgun magazine and a Glock standard-capacity handgun magazine with three live nine-millimeter rounds on the nightstand.  In a shoe underneath defendant's nightstand, officers found a sock containing a one-ounce baggie of methamphetamine.  Officers also found $3,850 underneath the nightstand.  In a satchel underneath the mattress, officers found two loaded nine-millimeter Beretta semiautomatic handguns, a nine-millimeter Glock handgun, an extended-capacity magazine that fit the Glock, and loose rounds of ammunition in two different calibers.

In the master bedroom closet, officers found a shoebox containing a sandwich baggie holding a few nine-millimeter rounds.  In a drawer of a television console in the master bedroom, officers found a .45-caliber Ruger handgun and a .40-caliber Springfield handgun with loaded magazines attached.  In another drawer, officers found $7,889, a calculator, rubber bands, and a bag containing 42 baggies of marijuana totaling 147 grams, 3 packages of powder cocaine totaling 21 grams, 46 packages of cocaine base totaling 17 grams, 58 packages of rock cocaine totaling 213 grams, and one plastic baggie containing 12.3 grams of methamphetamine.  Elsewhere in the master bedroom, officers

2

found a backpack containing more sandwich baggies and a digital scale, another box of sandwich baggies, and a brake fluid canister with a hidden compartment.

On the dining room table, officers found a digital scale, unopened boxes of sandwich baggies, and defendant's prescription for medical marijuana. In the kitchen, officers found three iced tea cans with hidden compartments. One of the cans contained 24 packages of cocaine each weighing approximately three and a half grams. Another of the cans contained 40 packages of cocaine base totaling approximately 150 grams. In a cabinet above the refrigerator, officers found jars of processed marijuana. Elsewhere in the kitchen, officers found more boxes of sandwich baggies and five pocket-sized digital scales.

In the living room, officers found a beanie containing a plastic baggie holding three .40-caliber rounds. Under a nearby sofa table, officers found a digital scale and a bathroom cleaner canister with a false compartment containing 40 individual packages of cocaine base totaling 149 grams. The officers found six .45-caliber rounds in a plastic bag in a hutch. Finally, the officers searched defendant's car. In the trunk, they found a notebook that appeared to be pay-owe sheets. In addition, they searched another car parked in the residence's garage and found a full box of .45-caliber ammunition.

After the search was completed, Sacramento Police Lieutenant Sameer Sood questioned defendant. Defendant claimed he stayed at the Center Parkway residence approximately three times a week but denied that he lived there. Defendant told the lieutenant, "Whatever is in the house is mine. I will ride for it." Lieutenant Sood clarified, "So all the illegal stuff in the house is yours?" Defendant responded, "Whatever is in the house, I will take it. It's all mine." He then requested an attorney. Department of Motor Vehicles records showed that defendant updated his address to the Center Parkway residence in January 2016.

Defendant was charged with possession of cocaine base for sale (Health & Saf. Code, § 11351.5) (count one); possession of cocaine for sale (Health & Saf. Code,

3

§ 11351) (count two); possession of methamphetamine for sale (Health & Saf. Code, § 11378) (count three); misdemeanor possession of marijuana for sale (Health & Saf. Code, § 11359) (count four); two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)) (counts five and six); and possession of ammunition by a felon (§ 30305, subd. (a)(1)) (count seven). It was further alleged that defendant was personally armed with a firearm in the commission of counts one through three (§ 12022, subd. (c)). Finally, the information alleged that defendant had previously served a prison commitment (§ 667.5, subd. (b)).

Following a trial, a jury found defendant guilty on all counts. The jury also found true all of the allegations that defendant was personally armed with a firearm. In a bifurcated proceeding, the trial court found the prior prison term allegation true. Defendant was sentenced to state prison for a total of 16 years four months, as follows: for count one, the upper term of four years plus five years for the personal arming enhancement; for count two, one year plus one year four months for the personal arming enhancement; for count three, eight months plus one year four months for the personal arming enhancement; for counts five through seven, eight months each; and for the prior prison commitment allegation, one year.

## DISCUSSION

### I

### *Pitchess Motion*

On April 4, 2017 and April 5, 2017, defendant filed two identical *Pitchess* motions seeking the disclosure of the personnel records of three police officers pursuant to Evidence Code sections 1043 and 1045. Defendant sought review of the detective's personnel record for material related to complaints or incidents involving falsification of evidence or testimony; discrimination on the basis of race, national origin, religion, gender, or sexual orientation; unlawful search and seizure; or any act involving moral

4

turpitude.  The trial court granted defendant's *Pitchess* motion based on a showing of good cause and conducted an in-camera hearing in the presence of county counsel and the custodian of records and determined that there was no discovery to disclose.

Defendant requests that we review the sealed record of the in-camera hearing to determine whether the trial court complied with required procedures and whether it abused its discretion when it found no discoverable items.  The Attorney General does not object to our independent review of the sealed transcript of the *Pitchess* hearing, as defendant requests.

This court granted defendant's request to augment the record to include a transcript of the in-camera *Pitchess* hearing.  The transcript was augmented with the sealed transcript of the in-camera *Pitchess* hearing, wherein the trial court provided a detailed itemized summary of all pertinent documents it reviewed during the *Pitchess* hearing sufficient for meaningful appellate review.  (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229 [to permit "meaningful appellate review," the trial court must make a record of the documents examined by photocopying them, making a list of them, or stating on the record what documents it reviewed]; *People v. Wycoff* (2008) 164 Cal.App.4th 410, 415-416 [conditionally reversing and remanding for a new *Pitchess* hearing in part because the custodian of records did not provide *either* the complete personnel file *or* a summary of the documents that were not presented for the court's review].)  Accordingly, our review is limited to the sealed record of the in-camera hearing on the *Pitchess* hearing.

Sections 832.5, 832.7, and 832.8 and Evidence Code sections 1043 through 1045 codify *Pitchess v. Superior Court, supra*, 11 Cal.3d 531, which recognized that "a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge."  (*People v. Mooc, supra*, 26 Cal.4th at p. 1219.)  If a defendant seeking to discover an officer's personnel records shows good

5

cause, then the trial court examines all relevant information from the custodian of records " 'out of the presence and hearing of all persons except the person authorized [to possess the records] and such other persons [the custodian of records] is willing to have present' [citations]." (*Id.* at p. 1226; see Evid. Code, §§ 915, subd. (b), 1045, subd. (b).) "The trial court may not disclose complaints more than five years old, the 'conclusions of any officer' who investigates a citizen complaint of police misconduct, or facts 'so remote as to make [their] disclosure of little or no practical benefit.' (§ 1045, subd. (b); [Citation].)" (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019.) "A trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220.)

As requested, we have reviewed the sealed transcript of the in-camera proceeding in which the trial court questioned the custodian of records under oath regarding the three officers' personnel records. Based on our review, we conclude the trial court did not abuse its discretion in finding that no materials subject to disclosure and responsive to defendant's request existed.

II

*Batson/Wheeler Motion*

The prosecutor used a peremptory challenge to excuse an African-American member of the jury venire. Defendant, who is African-American, challenged the prosecutor's action under *Batson/Wheeler*. (*Batson, supra*, 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.) The trial court denied the motion, finding the prosecutor did not excuse the prospective juror based on her race.

Defendant contends the trial court erred because the prosecutor's reasons for removing the prospective juror were pretextual, and the court did not make a sincere and reasoned evaluation of the prosecutor's reasons for striking the juror. We disagree.

6

A.    Background

The trial court called 22 prospective jurors for questioning.  During the trial court's voir dire, prospective juror Ms. B. stated that she worked for the Department of Child Protective Services.  She said that she does not get involved in criminal investigations or have contact with law enforcement officers in the course of her work.  Ms. B. said that she has two cousins who are members of the Fairfield Police Department and a third relative who was becoming a member of the Fairfield Police Department, but her relationship with these individuals would not affect her ability to be fair.  Ms. B. confirmed that she "would be okay . . . knowing that . . . [she] wouldn't be determining what the law was or whether any punishment was appropriate."

Following the attorneys' questioning, the parties began to exercise peremptory challenges.  The prosecutor excused five jurors and defense counsel excused four jurors before the trial court called up additional prospective jurors for questioning.  The trial court and attorneys conducted similar questioning of the new prospective jurors.  After questioning, peremptory challenges resumed with defense counsel.  Once each attorney had exercised their sixth challenge, the prosecutor passed.  After the prosecutor passed, defense counsel excused another juror and the prosecutor passed once again.  After the prosecutor's second pass, defense counsel and the prosecutor each excused a juror.  Then, the prosecutor moved to excuse Ms. B.  Defense counsel immediately raised *Batson-Wheeler*.

After a recess, the trial court asked defense counsel to explain her motion.  Counsel explained that she was "making a motion . . . as to African-American jurors . . . [s]pecifically, as to Ms. B[.]," noting that the prosecutor had passed twice.  After the trial court found a prima facie case, the prosecutor began to explain his reasons for excusing Ms. B.  He stated, "First, I suppose I should state explicitly that I am not kicking her because of her perceived nationality or ethnicity."  The trial court interrupted to note that

7

another juror, who "appear[ed] to be African-American," remained on the jury. The prosecutor continued: "As to the fact that I passed twice with her on the panel: The reason I passed is because I would have been satisfied to have her in the jury as so composed. [¶] When [defense counsel] . . . continued to exercise additional challenges completing the number of her challenges, I did at that point . . . feel . . . that I had a sufficient number of challenges that I could still be able to kick out or exercise challenges to new people, should new more objectionable people come in. And that's . . . where the timing is coming from. [¶] As to Mrs. B[.] herself, the primary factor that I was considering was . . . I, over the lunch our [*sic*], looked at her . . . public Facebook account. And in her Facebook post was a post that I couldn't make sense of. . . . [¶] I already did have some concerns, as I have had previous bad experience with CPS workers, on . . . juries before. But that's not a determinative factor."

The prosecutor further explained that the concerning post on Ms. B.'s Facebook profile "was a screenshot of an e-mail that said: Under the law, there is a change of law . . . and send this to all your parolees: That in California, it's no longer legal to ask somebody if they previously [have] been convicted of a felony. [¶] And then words to the effect of: So now there can't be any further -- sort of dirt-bag excuses for not getting a job." The prosecutor further explained: "I took it as sort of a very ambiguous post. I couldn't understand if it was derogatory towards parolees for not having a job, if it was a pro-criminal justice reform of wanting parolees to . . . celebrating [*sic*] greater access to the job market . . . it did seem significant to me, and I thought it was going to cut strongly one way or the other. [¶] And, frankly, I waivered on my interpretation of it . . . going back and forth, trying to decide. It appeared to me that there was . . . ease of additional peremptories for me to use, I thought since I can't figure it out, I can't understand what it means, it could very well be exhibiting an anti law enforcement bias. [¶] And since [defense counsel] has exercised so many additional challenges, I will have extra anyway.

8

Then I thanked and excused her rather than having her on the panel and regret it the next day."

Defense counsel pointed out that Ms. B. and defendant were both African-American, that Ms. B. was the second African-American juror excused by the prosecutor, and that Ms. B. made no statements that distinguished her from any other juror. Defense counsel also admitted that she had not researched Ms. B. nor her Facebook post. The trial court denied the motion, ruling: "I must say this is a rather unorthodox *Wheeler* motion in that information upon which Counsel relies upon is extra judicial, nonetheless, there is probably nothing inappropriate relying upon information that was outside of the record in terms of one's preference regarding the selection of jurors. [¶] Accepting the representation that Counsel has made -- and I note, no [] reason to doubt his representation in terms of his investigation of this juror – I'm not sure, Counsel you do either -- it does appear that he has a race neutral reason to exclude this juror, notwithstanding the fact that he did pass before. [¶] . . . [¶] But . . . I do find that [the prosecutor] has sufficiently articulated a race neutral basis to exclude Ms. B[.]" The prosecutor asked the trial court for permission to include a printout of the Facebook post in the court's file, which the court allowed. Outside the presence of the jury, the prosecutor offered "a Facebook image from a juror" as a court exhibit for the trial court's file "to preserve it." The trial court accepted the document as a court exhibit.

B.    Analysis

A prosecutor may not use peremptory challenges to remove prospective jurors solely because they are members of an identifiable racial group. (*Batson, supra*, 476 U.S. at p. 89; *People v. Wheeler, supra*, 22 Cal.3d at pp. 265-266, 272.) The three-step inquiry under *Batson/Wheeler* is well established. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the

9

prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*).)

"A prosecutor asked to explain his conduct must provide a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. [Citation.] Certainly a challenge based on racial prejudice would not be supported by a legitimate reason." (*Lenix, supra*, 44 Cal.4th at p. 613.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.' " (*Lenix, supra*, 44 Cal.4th at p. 613.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and

10

give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix, supra*, 44 Cal.4th at pp. 613–614.)

Here, substantial evidence supports the trial court's denial of defendant's *Batson/Wheeler* motion. It shows the prosecutor excused Ms. B. for genuine reasons unrelated to race. He feared Ms. B. would be sympathetic to defendant because of a post she shared on social media regarding parolees and struggled with how to interpret the post. He also stated that he "had previous bad experience with CPS workers, on . . . juries before. But that's not a determinative factor." These reasons are inherently plausible and are supported by the record. Indeed, defendant points to nothing in the record to contradict the prosecutor's concerns. Even if the prosecutor was mistaken about his impression of Ms. B.'s Facebook post, that is an insufficient ground to reverse based on *Batson/Wheeler*. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) Defendant likewise does not direct this court to anything in the record that contradicts the two nondiscriminatory reasons given for peremptorily challenging Ms. B.

Defendant argues that the trial court failed to evaluate whether the prosecutor's reasons for excusing Ms. B. were subjectively genuine. He contends the trial court "simply rubber-stamp[ed] the prosecutor's reasons." We disagree. Because the prosecutor offered race-neutral reasons for excusing Ms. B. and those reasons were inherently plausible and supported by the record, the trial court was not required to question the prosecutor or make detailed findings. The record demonstrates that the trial court engaged in a sincere evaluation of the prosecutor's reasons. For example, the trial court referred to the prosecutor's reliance on Ms. B.'s Facebook post in his ruling on defendant's *Batson/Wheeler* motion, reasoning that there was "nothing inappropriate relying upon information that was outside of the record in terms of one's preference regarding the selection of jurors." "Even a brief reference to the prosecutor's reasons and

11

the trial court's own observations of the challenged jurors can constitute a sincere and reasoned evaluation of the credibility of the prosecutor's justifications." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 399.) Additionally, the record demonstrates that the trial court was actively listening to the prosecutor's reasons and engaged in the *Wheeler/Batson* inquiry. For example, when the prosecutor was addressing Ms. B.'s race, the trial court interrupted to specify that another juror who appeared to be the same race as Ms. B. remained on the jury. These observations demonstrate that the trial court was considering the totality of the circumstances in ruling on the *Batson* motion and was not merely accepting the prosecutor's reasons.

The Supreme Court has expressly rejected a requirement that the trial court must "explain in detail why it is accepting the proffered reasons for a challenged excusal . . . ." (*People v. Mai* (2013) 57 Cal.4th 986, 1049, fn. 26; see also *People v. Jackson, supra*, 13 Cal.4th at p. 1198 ["*Wheeler* does not require the trial court to conduct further inquiry into the prosecutor's race-neutral explanations if, as here, it is satisfied from its observations that any or all of them are proper"].) Here, the trial court explained that it accepted the prosecutor's representation about discovering Ms. B.'s Facebook post and the reasons the prosecutor initially passed twice. The trial court stated it had no reason to doubt the prosecutor's representation, and defense counsel offered the trial court no such reason either. This amounted to evaluating the prosecutor's credibility and satisfied the third step of the *Batson* procedure. (See *Mai*, at p. 1050 [where "the trial court then made a ruling, pursuant to step three, that the reasons expressed were valid . . ., we too may simply proceed as though this is a step three case, analyzing whether the trial court properly accepted the race-neutral reasons given by the prosecutor"].)

In sum, the record shows the court made a sufficient attempt to evaluate the prosecutor's reasons for excusing Ms. B. and to express its findings. It was not required to make a detailed statement because the prosecutor's reasoning was plausible and supported by the record. The court heard the prosecutor's reasons and found them to be

12

genuine. It was thus not required to express its findings in a detailed manner. We thus conclude the court did not abuse its discretion in denying defendant's *Batson/Wheeler* motion.

III

*Admission of Photographs*

Defendant contends the trial court abused its discretion by admitting "photographs depicting appellant with cash and guns." He contends this purported evidence was more prejudicial than probative under Evidence Code section 352. Defendant does not identify which exhibits he contends were erroneously admitted, but the Attorney General notes that "[t]he trial court admitted two photographs of cash (People's Exhibits 125 and 127), one photograph of [defendant] holding cash (People's Exhibit 124) and two photographs purportedly depicting a Glock handgun (People's Exhibits 128 and 129)." The Attorney General contends that to the "extent [defendant] challenges admission of photographs depicting cash, he failed to object to those photographs during trial and has forfeited this claim." Further, the Attorney General argues that the trial court did not abuse its discretion in admitting the two photographs because they were strong circumstantial evidence defendant committed the charged offenses, and the evidence was not more prejudicial than probative. We agree.

The prosecutor introduced photographs extracted from one of defendant's cell phones. People's Exhibit 124 depicted defendant "holding cash." People's Exhibit 125 depicted what "[a]ppear[d] to be a large amount of U.S. currency." Defendant did not object to either photograph. The prosecutor also introduced People's Exhibit 127, described as "a separate photograph of U.S. currency." Defendant did not object to this photograph. Accordingly, defendant's objection to admission of these three photographs of cash as unduly prejudicial has been forfeited and cannot be raised on appeal. (Evid. Code, § 353.)

13

Subsequently, defense counsel requested a side bar and asked, "that the Court exclude image[s] of firearms that had been found." In summarizing the side bar discussion for the record, defense counsel explained that she objected based on foundation and under section 352: "Based on the fact that there are firearms involved in this case, we cannot tell if these are the same firearms as those that are found in the house; therefore, they are more prejudicial than probative." The trial court stated that it had overruled the objection because the photograph was discovered "on a phone that is attributed to the defendant" and "arguably" depicts "the exact same gun" found under defendant's bed. The trial court reasoned, "[T]hat would put the defendant in possession of the same firearm that was seized. And it would go not only to the issue of possession, but it would also be relevant to the defendant's knowledge."

After the sidebar, the prosecutor next introduced People's Exhibit 128 and People's Exhibit 129. Exhibit 128, a photograph, was not described on the record, but according to the exhibit list, Exhibit 128 depicted a "BLACK SEMI-AUTOMATIC HANDGUN WITH CLIP BESIDE IT AT RIGHT LYING ON CAMOU[F]LAGE CLOTH ARTICLE." The investigator explained that Exhibit 128 was extracted from defendant's cell phone but its origin was unknown. Exhibit 129 was a photograph of "a Glock." Exhibit 129's origin was also unknown.

"A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.] An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

"The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section [Evidence Code section] 352, 'prejudicial' is not synonymous with 'damaging.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

We find no abuse of the court's wide discretion here. Relevant evidence is evidence, "including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The two photographs of guns extracted from defendant's cell phone were relevant because it was strong circumstantial evidence tending to show defendant knowingly possessed the same Glock on the day the police searched his residence. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [where evidence did not establish the gun necessarily was the murder weapon it showed defendant possessed a gun that might have been the murder weapon and was relevant and admissible as circumstantial evidence defendant committed the charged offenses].) Here, the prosecution's theory was that defendant knowingly possessed the Glock handgun found under his mattress because he had pictures of the same gun on his cell phone. To this end, the photographs had significant probative value in establishing that the nine-millimeter Glock handgun underneath the mattress belonged to him. In comparison to the probative value of the photographs, any prejudicial effect was minimal. For instance, there is no indication that the photographs depicted defendant with the gun, holding the gun, or firing the gun. This minimized the likelihood that the jury would have reacted viscerally to the images. In addition, images of the multiple guns that were recovered from defendant's residence were already admitted into evidence, further reducing any emotional reaction the jury may have had upon viewing the photographs. Therefore, the photographs were not unduly prejudicial.

15

Finally, defendant argues that admission of the photographs was cumulative because there was "expert testimony on this issue." Specifically, he purports this evidence was cumulative to expert testimony regarding the phone's "location analysis, as well as his analysis of drug-dealing text messages contained on the phone." Defendant does not explain how this expert analysis of the phone was cumulative to evidence defendant had images that possibly matched one of the guns found in the home on his phone. No expert testified about whether the gun in the photographs was identical to the gun defendant possessed. This was a factual matter for the jury to resolve. Accordingly, the photographs were not cumulative of expert testimony.

The trial court did not abuse its discretion by admitting the gun photographs.

IV

*Senate Bill 136*

In supplemental briefing, defendant claims his prior prison term enhancements must be vacated based on the retroactive application of Senate Bill 136. The People agree.

We agree with the parties that the amendment to Senate Bill 136 should be applied retroactively in this case. Whether a particular statute is intended to apply retroactively is a matter of statutory interpretation. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307 [noting "the role of a court is to determine the intent of the Legislature"].) Generally speaking, new criminal legislation is presumed to apply prospectively unless the statute expressly declares a contrary intent. (§ 3.) However, where the Legislature has reduced punishment for criminal conduct, an inference arises under *In re Estrada* (1965) 63 Cal.2d 740 " 'that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' [Citations.]" (*Lara*, at p. 308.) "A new law mitigates or

16

lessens punishment when it either mandates reduction of a sentence or grants a trial court the discretion to do so.  [Citation.]" (*People v. Hurlic* (2018) 25 Cal.App.5th 50, 56.)

Here, Senate Bill 136 narrowed who was eligible for a section 667.5, subdivision (b) prior prison term enhancement, thus rendering ineligible many individuals, including defendant who served a prior prison sentence based on a prior conviction for the sale, transportation, or offer to sell a controlled substance (Health & Saf. Code, § 11352, subd. (a)).

Under these circumstances, we conclude *Estrada*'s inference of retroactive application applies.  (See, e.g., *People v. Nasalga* (1996) 12 Cal.4th 784, 797-798 [applying *Estrada* inference of retroactivity to legislative changes to § 12022.6, subds. (a) and (b) enhancements].)  Accordingly, we will direct the trial court to strike defendant's prior prison term enhancement and "remand the matter for resentencing to allow the court to exercise its sentencing discretion in light of the changed circumstances." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682.)

## DISPOSITION

The trial court is directed to strike defendant's section 667.5, subdivision (b) prior prison term enhancement.  In all other respects, the judgment is affirmed.  The matter is remanded for resentencing.

 

_____
HULL, J.

We concur:


_____
RAYE, P. J.


_____
RENNER, J.

17